UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

In the Matter of the Complaint of        10 Civ. 4844
MORAN TOWING CORPORATION,
as Owner and Operator of the TUG         AMENDED OPINION
TURECAMO GIRLS, for Exoneration
from or Limitation of Liability,

                    Petitioner.

------------------------------------X



A P P E A R A N C E S:

        Attorneys for Petitioner

        CLARK ATCHESON & REISERT
        7800 River Road
        North Bergen, New Jersey 07047
        By:  Richard Joseph Reisert, Esq.
             Frank A. Atcheson, Esq.
             Stephen K. Carr, Esq., Of Counsel

        Attorneys for Claimant

        KREINDLER & KREINDLER
        100 Park Avenue
        New York, NY  10017
        By:  Daniel O. Rose, Esq.
             Megan Wolfe Benett, Esq.

**Sweet, D.J.**

Two actions were tried to the court from May 20, 2013 through June 4, 2013, the petition for exoneration filed by the petitioner Moran Towing Corporation ("Moran" or the "Petitioner") and a Jones Act and general maritime law action for negligence filed by claimant Avril Young ("Avril Young" or the "Claimant").  These actions arise out of the crushing to death on December 27, 2011 of Ricardo Young ("Young" or the "Decedent") a deckhand who was entrapped in the capstan of the Turecamo Girls, a Moran tug (the "Tug"), by a towline under great pressure during an improperly conducted swing maneuver.

The horror of this incident has raised difficult issues which were presented with skill by very competent advocates.  Upon all the prior proceedings and the facts and conclusions of law set forth below, judgment will be entered on behalf of Avril Young.

**Prior Proceedings**

On June 22, 2010, the Petitioner filed a Petition for Exoneration from or Limitation of Liability in this district, pursuant to 46 U.S.C. §§ 30501 et seq., and the various statutes

1

supplemental thereto and amendatory thereof, and Rule F of the
Supplemental Rules for Admiralty and Maritime Claims ("Admiralty
Rules") arising out of the events surrounding Young's death.

On September 8, 2010, the Claimant, as administrator
of the Estate of Young, filed an Answer admitting that the case
is within this court's admiralty and maritime jurisdiction
pursuant to 28 U.S.C. § 1333(1), Rule 9(h) of the Federal Rules
of Civil Procedure and Rule F of the Admiralty Rules, and
demanded a trial by jury.  On that same date, the Claimant filed
a claim on behalf of the Estate and on behalf of the decedent's
minor son, Nicholas Young ("Nicholas"), but at that time the
Claimant had not yet been appointed as the legal guardian of
Nicholas or the administrator of the Estate.

On July 11, 2011, the Claimant, on behalf of herself,
individually and as the administrator and personal
representative of the Estate of Young and all other wrongful
death beneficiaries and heirs, filed a First Amended Claim under
the Jones Act, 46 U.S.C. § 30104 and general maritime law and
demanded a trial by jury.  Petitioner then moved pursuant to
Rules 12(f) and 39(a)(2) of the Federal Rules of Civil Procedure
to strike the Claimant's demand for a jury trial on any issues

2

pertaining to exoneration from or limitation of liability. The
Claimant then cross-moved pursuant to Rules 38 and 39 of the
Federal Rules of Civil Procedure to empanel a jury to hear and
render a verdict as to her claims under the Jones Act and
general maritime law.

By opinion of April 11, 2013 (the "April 11 Opinion"),
it was held that there is no right to a jury trial on issues
pertaining to exoneration or limitation of liability, but that
there is a right to a jury determination in a Jones Act action.

On April 16, 2013, Moran filed a motion for partial
summary judgment.  On May 20, 2013, after the Claimant waived
her jury demand, a bench trial was commenced on the petition for
exoneration and the Jones Act and general maritime law action.
Both actions were tried to the court from May 20, 2013 through
June 4, 2013, post-trial submissions were completed on August 9,
2013 and the parties presented final arguments on October 1,
2013 at which time the actions were considered fully submitted.

**The Facts**

In the early morning hours of December 27, 2009, Young, a deckhand, was crushed to death in the capstan of the Tug. (Joint Pretrial Order, Stipulated Facts, "Stipulated Facts"; at ¶ 1.) At the time of the fatal incident, the Tug was pushing the barge Lisa (the "Barge") on a "sludge run" down the Hackensack River from a waste disposal site in Little Ferry, New Jersey to Wilson Avenue in Newark, New Jersey. (Stipulated Facts at ¶ 5.) The Tug and Barge departed Little Ferry just after midnight and were about an hour into its voyage when Young's death occurred. (Stipulated Facts at ¶ 8.) The crew on board the Tug at the time of the incident consisted of Captain Michael Staszko ("Staszko"), mate Philip Allen ("Allen"), engineer Thomas Best ("Best"), Young and deckhand Charles Taibi ("Taibi"). (Stipulated Facts at ¶ 7.) At the time of Young's death, Allen was in the upper wheelhouse operating the Tug; Young was at the rear ("aft") deck and Best was in his cabin doing paperwork. Staszko and Taibi were off-duty asleep. (Stipulated Facts at ¶ 12.)

Staszko has been employed by Moran in various capacities since 1978, starting as deckhand and elevated to

4

Captain (or Master) in 1990 or 1991. (Trial Transcript, "Tr. Trans."; at 1055-1058.) He has been serving as captain of the Tug since 1999 (Tr. Trans. at 1055; Trial Exhibit, "Exhibit"; 339), and was familiar with the Little Ferry to Newark run because the Tug had been performing the service about three to four times every two weeks for the last twelve to thirteen years. (Tr. Trans. at 143; 174; 1033-1034; 1071-1072.) He was qualified to serve as the Tug's master.

Allen was duly licensed as a Master of any towing vessel of not more than 1600 tons, and had been serving as mate of the Tug since 2007. (Tr. Trans. at 66.)  He was fully familiar with the Little Ferry to Newark run, given the frequency of the Tug's employment in that service. (Tr. Trans. at 143.) He was qualified to serve as the Tug's mate. (Tr. Trans. at 130-132; 1063-1066.)

Best was a Coast Guard licensed marine engineer who had been the chief engineer of the Tug since 1998. (Exhibit 338.) Best was qualified to serve as the Tug's chief engineer. (Tr. Trans. at 192-196; 1067-1068).

5

Taibi had been employed as a deckhand by Moran since 2001 and had been a deckhand aboard the Tug for six years. (Tr. Trans. at 1023-1024; Exhibit 340.)  Taibi was qualified to serve as a deckhand on the Tug. (Tr. Trans. at 141-142; 1066-1067.)

Young was born in Guyana on April 7, 1951 and had worked as a deckhand and bosun aboard vessels in the Caribbean for several years before he immigrated to the United States in 1999. (Tr. Trans. at 907; Ex 203.)  After arriving in the U.S., he worked for a fishing boat company in Florida before he began working for Moran as a deckhand in 2006. (Tr. Trans. at 17; 1122-1123; Exhibit 203; 324.) Young became the deckhand of the Tug in August 2008, and received a vessel orientation on the Tug including its deck machinery. (Exhibit 324 §§ 14-16.) Given the frequency of the Tug's work on the Hackensack River sludge run, he was familiar with and had experienced the Little Ferry to Newark run and performed the trip on the same watch with Allen and was a competent deckhand and qualified to serve on the Tug. (Tr. Trans. at 138-139; 139; 143-144.)

As master or captain, Staszko was "responsible for the safe, economic and efficient operation of the vessel." (Tr. Trans. at 1132.)  As mate, Allen was the "direct representative

6

of Moran and responsible for administering Moran policies and
procedures." (Tr. Trans. at 68.)  Aside from the captain, all
crewmembers aboard the Tug on the night of the incident,
including engineer Best, were subject to Allen's orders. (Tr.
Trans. at 67.)   Best's primary responsibility on the Tug was to
maintain its equipment. (Tr. Trans. at 196.)  Best was available
to assist on deck if asked by the captain or mate. (Tr. Trans.
at 198.)  Deckhands aboard Moran tugboats handle lines, act as
lookouts and do whatever else is required of them. (Exhibit 313,
104.)


The Tug was constructed in 1965, has two engines and
is 91 feet long, 27 feet wide, weighs 199 gross tons and
produces approximately 2,000 horsepower.  (Tr. Trans. at 68-69;
Exhibits 7, 92.) The Barge is approximately 272 feet long and 68
feet wide and has a draft of 13-14 feet, and weighed
approximately 15 million pounds on the night of the incident.
(Tr. Trans. at 69; 1271; Exhibit 92, 9.)   The Barge does not
have a "notch" that would link the Tug to the barge. (Tr. Trans.
at 71; 296; Exhibit 184, photo 12.)  The bow of the Barge has a
marker indicating where the tip of the bow of the Tug should
line up. (Tr. Trans. at 71.)

The Tug uses "push gear" to secure the Barge to the Tug. (Stipulated Facts ¶ 15.) When pushing down the Hackensack River, the bow of the Tug is aligned against the bow section of the Barge. (Tr. Trans. at 70.)  The bow of the Tug is not aligned against the stern of the Barge, and the Barge is instead "pushed backwards" because there is not enough room in the river at Little Ferry to turn the Barge around.  (Tr. Trans. at 72.) The "push gear" includes push lines that run from the deck bits on the bow section of the Barge to the aft quarter bitts of the Tug. (Stipulated Facts ¶ 16.)  The port (left side) push line is a fixed line. (Stipulated Facts at ¶ 17; Exhibit 184, photo 31.) The starboard (right side) push line passes from the starboard aft quarter bit around the capstan to the H-bitt (so designated presumably because of its shape).  (Stipulated Facts at ¶ 19; Exhibit 184, photo 33.) The main towing lines, the push gear or push lines, are the Tug's equipment. (JPTO 15, 16; Tr. Trans. at 18; 1026-127.)  The starboard push gear is adjustable by use of the capstan. (Stipulated Facts at ¶ 18; Exhibit 184, photo 33.) The capstan is located on the aft deck.  (Tr. Trans. at 1060; Exhibit 384, photo 3.) The Tug has a ten horsepower capstan.  A capstan is a mechanical, electrically-powered drum used to bring in the starboard push line.  (Tr. Trans. at 74; 227.)

8

When the Tug and Barge are secured to each other
("made-up") at Little Ferry, the starboard push line passes from
the starboard aft quarter bit on the Tug and is wrapped several
times around the capstan, and then tied off on the H-bitt.
(Stipulated Facts at ¶ 19; 23.)  The capstan is controlled by a
"capstan controller" which, on the night of the incident, was
located approximately 36 inches from the capstan on the aft
bulkhead of the main house of the Tug.  (Stipulated Facts at ¶
20; Exhibit 384, photo 3; 24.)  The controller has three
buttons: forward, reverse and stop. (Tr. Trans. at 229; Exhibit
389, photo 26.) At the time of the incident, the forward and
stop buttons were painted white and the reverse button was
painted black. (Exhibit 389, photo 26.)

A "swing maneuver" is used to bring in slack that has
developed in the starboard push gear as the Tug and Barge
maneuver down the river. In conducting the maneuver the Tug
makes three turns: the first, a swing to the right, the second,
a swing to the left, and the final swing back right. (Stipulated
Facts at ¶ 22; 25; 31.)  During the first right turn, the Tug is
turned (swung) to starboard about 10-15 degrees with the stern
of the Tug swinging to port, stretching the starboard towline as

9

far as possible. (Tr. Trans. at 711; 720; Exhibit 304, Animation of Standard Swing Maneuver.) During the second turn, the Tug is swung back to port with the stern of the tug swinging to starboard, developing maximum slack in the starboard pushline. (Tr. Trans. at 712; Exhibit 304, Animation of Standard Swing Maneuver.) Then the captain or mate (whichever is on watch) calls the deckhand on the radio and gives the order to "take it as it comes." (Stipulated Facts ¶ 26; Exhibit 304, Animation of Standard Swing Maneuver.) The deckhand activates the capstan, by use of the forward button on the capstan controller. (Tr. Trans. at 91-92; 99.) The capstan turning in the forward direction brings in the slack that has developed. (Exhibit 304, Animation of Standard Swing Maneuver.) Once the slack has been pulled in, the capstan is stopped. (Tr. Trans. at 712-13; Exhibit 304, Animation of Standard Swing Maneuver.) The deckhand then unties the towline that had been wrapped around the H-bitt, manually pulls in the towline slack that is now between the capstan and the H-bitt, and then re-ties the towline on the H-bitt. (Tr. Trans. at 713; Exhibit 304, Animation of Standard Swing Maneuver.) When this is done, the deckhand advises the captain or mate that the line is "all fast," indicating that the towline has been securely tied off on the H-bitt, and it is safe to commence the final turn in the swing

10

maneuver.  (Tr. Trans. at 713; Exhibit 304, Animation of
Standard Swing Maneuver.)

On the Little Ferry-Newark transit, this swing
maneuver is performed on the approach to the Jackknife Bridge,
in the vicinity of Buoy 18 because of the natural bend and
widening of the river at this point. (Tr. Trans. at 83; 91;
1093; 1227-1228.) Under Moran's Safety Management System,
codified in its Operations Policy and Procedures Manual
("OPPM"), the navigator has discretion to call out a second
person to attend on the aft deck during the line tightening.
(Exhibit 313 § 5.2.4.1.)

Prior to December 26, 2009, the Tug had towed the
Barge from the sewage treatment facility at Wilson Avenue in
Newark, New Jersey to the sewage treatment plant in Little
Ferry, New Jersey via the Hackensack River. (Tr. Trans. at 72.)
On December 26, 2009, the Tug returned to Little Ferry to pick
up the loaded Barge and deliver the Barge back to Wilson Avenue.
(Tr. Trans. at 22).

The Hackensack River is a tidal waterway and the
Little Ferry-Newark trip is known as a "tide job," which must be

11

performed under flood tide conditions to allow for sufficient depth in the river to accommodate the loaded Barge. (Tr. Trans. at 1074-1076.) The Tug arrived at Little Ferry before the tide changed from ebb (meaning the water in the river is flowing south or down river) to flood (when the water is flowing north or upriver). (Tr. Trans. at 1076-1077.) Because the move is a "tide job," it is always performed under substantially similar conditions of tide and current. (Tr. Trans. at 80; 1075-1076.)

The Tug arrived at Little Ferry on December 26, 2009 at about 11:00 p.m. (2300 hours) with Staszko and Taibi on the watch. (Tr. Trans. at 72-73; 77; Exhibit 13.) When the flood tide began, Staszko positioned the bow of the Tug against the bow section of the Barge, and deckhand Taibi made up (connected) the Tug to the Barge, assisted by two men aboard the Barge. (Tr. Trans. at 1073-1074.)  The men on the barge worked for Spectraserve, the operator of the Barge and not Moran. (*Id.*) Allen and Young were off duty during the Tug and Barge make-up procedure.

Taibi handled the lines on the Tug and the Barge's crew handled the lines passed from the Tug to the Barge. (Tr. Trans. at 1026-1027.) During the make-up process, the Tug was

12

maneuvered so that Taibi could pass the Tug's port push line to the Barge where the line was secured to a bitt near the corner of the Barge. (Tr. Trans. at 1027; 1079-1080; 260; 354; 355; 356; Exhibit 84, photos 30-32.) Taibi then secured the port push line to a bitt on the port stern of the Tug.  (Tr. Trans. at 10275; 1079-1080.) The port push line was a fixed line secured by hand (without the use of the capstan) and once made fast, was not adjusted during the trip. (Tr. Trans. at 136.)

After the port push line was secured, Staszko maneuvered the Tug so that Taibi could pass one end of the Tug's starboard push line to the Barge, where it was made fast. (Tr. Trans. at 1027; 1079-1080.) The starboard push line was comprised of a shorter Kevlar line with a loop or eye at one end that is secured to the Barge.  A shackle is fixed to the other end of the Kevlar line. (Tr. Trans. at 74; 101; Exhibit 184, photo 6.) A seven-inch polyester line with an eye spliced into one end is then secured to the Tug's starboard aft quarter bit, led four times through the shackle, then led around the quarter bitt to the Tug's capstan. (Tr. Trans. at 74; 139-140; 1081; Exhibit 184 photos 28, 33.) This four-part line (also known as a four-part purchase) creates a mechanical advantage with the result that any forces applied to the line at the corner of the

13

Barge are reduced by a factor of four when the line is brought to the capstan. (Tr. Trans. at 139-140; 1329.)

After setting up the starboard push gear, Taibi led the tail end of the seven inch polyester line around the Tug's starboard stern quarter bitt and then to the capstan. (Tr. Trans. at 1081.) Taibi made three to four clockwise turns around the capstan with the line and activated the capstan's "forward" button causing the push line to draw tight. (Tr. Trans. at 1028.) Taibi added additional clockwise turns of line around the capstan until the capstan was full. (see Tr. Trans. at 140-141; 1028.) At this point, there were five turns on the capstan. (Tr. Trans. at 142; 1028; 1212-1213; 1317; 1332; Exhibits 354; 184, photo 33; 336, photo 006; 344, photos 049, 051.)

After Taibi filled up the capstan he secured the tail end of the line to the H-bitt located on the centerline of the Tug close to the Tug's after bulkhead. Taibi made the line fast with three figure-eight turns with additional turns up to the top of the vertical post. (Tr. Trans. at 1033; see, e.g., Exhibits 336, photos 005 and 014; 344, photo 053.)

14

At this point, the wind was blowing northeast at 25 mph, it was 35-40 degrees Fahrenheit and visibility was "fair." (Tr. Trans. at 79; Exhibit 9.)  It was raining.  (Tr. Trans. at 1120.) The current of the Hackensack River was flowing at 56 degrees true, and the reciprocal was 222 degrees true.  (Tr. Trans. at 286.)  The current was a flood current, meaning the current was upriver against the direction of the Tug and Barge, which was heading downriver.  (Tr. Trans. at 80.)  The current was approximately two and a half knots or more.  (Tr. Trans. at 288.)  It was a "good flood current."  (Tr. Trans. at 80.)

Allen and Young assumed the watch at midnight and held a pre-shift planning meeting before the unit got underway. (Tr. Trans. at 138-139; 143; 167-168; 1034; 1224; Exhibit 2).

The Barge and Tug departed Little Ferry on December 27, 2009, just after midnight. After getting underway, Allen steered from the upper wheelhouse of the Tug while Young stood by in the galley. (JPTO 8 and 9.) During the trip down the Hackensack River, the starboard towline developed about one to two feet of slack due to the maneuvering of the Tug and the Barge.  (Tr. Trans. at 82-83.) At about 1:00 a.m., or about an hour after departing Little Ferry, the Barge and Tug were

15

between the Route 3 tandem bridges and approaching Buoy 18.
(*Id.*) Allen contacted the upcoming Jackknife Bridge to ask for
an opening. (Tr. Trans. at 86-87; 146; Exhibit 3). Then, using
the Tug's radio, Allen contacted Young in the galley and told
him to get ready to tighten up the lines. (Trial Tr. 87; 146.)
It was still raining with a wind of fifteen to twenty knots.
(JPTO 11; Tr. Trans. at 129; 138-39.)

When summoned by Allen, Young was engaged in a
conversation with his wife on his cell phone and asked if he
could wait inside the galley a bit longer. Allen agreed because
of the weather conditions. (JPTO 23; Tr. Trans. at 84-86; 147;
171; Exhibit 377.)  Just past the second of the Route 3 bridges
(near the "dolphins" marked on Exhibit 4), Allen instructed
Young to head aft to begin the line tightening in the swing
maneuver. (Tr. Trans. at 146-148; Exhibit 4.) Young acknowledged
the order, left his cell phone and eyeglasses in the galley, and
walked back to the aft deck. (Tr. Trans. at 87; 101; 171.)

Allen began the swing maneuver as Young was walking
aft (*see* Tr. Trans. at 88, 89, Exhibit 6 ("Allen Statement")[1]),

---

[1] The "Allen Statement" is the statement Mate Allen wrote for himself two or
three days after the incident. (Tr. Trans. at 96-97.) Allen agreed that when
he wrote the statement, he was "obviously trying to be as accurate in [his]
recollection as possible." (Tr. Trans. at 97.)

and "put the right rudder and started the swing as [he] called
[Young] to come out on deck." (Tr. Trans. at 99; Exhibit 6.)
Allen put the right rudder in for about four to five seconds
before beginning the second step of the maneuver, the left
swing. (Tr. Trans. at 90.) During that four to five seconds of
the first turn, Allen swung the Barge approximately five degrees
to the right. (Tr. Trans. at 90.)

Allen saw Young walk aft and observed his shadow
moving around the aft deck area. (Tr. Trans. at 148-149; 1231.)
From the upper wheelhouse, Allen could not see Young operate the
capstan or handle the lines. (Tr. Trans. at 1231.)

After the Barge and Tug began swinging to the right,
Allen applied left rudder which brought the stern of the Tug
closer to the Barge, thereby gathering slack in the starboard
push gear. (Tr. Trans. at 92; 101; 1232; 1238.) As Allen moved
the rudder left, he radioed Young and instructed him to "take it
as it comes." (Tr. Trans. at 91; 150-151; Stipulated Facts at
¶ 26.) After Allen instructed Young to remove the slack, Allen
saw the Tug's deck lights flicker, which indicated to him that
the capstan had been activated. (JPTO 27; Tr. Trans. at 92; 101;
149; 750.)

17

Young pushed the forward button on the capstan controller and took in the slack. (Tr. Trans. at 293.) After the slack of 1-2 feet was taken in Young stopped the capstan and began to take off the line on the H-bitt.[2] Young began unwrapping the H-bitt. Allen proceeded with the left turn for approximately 35 to 60 seconds. (Tr. Trans. at 94; 99; 312.)

After putting in the left rudder, Allen wanted the Tug and the Barge to swing toward his target, a set of condos on the eastern side of the Hackensack River near the Jacknife Bridge. (Tr. Trans. at 105; Exhibit 5.) During the left turn, the Tug and Barge began to swing past the condos and past the intended course, towards a shallow 14-15' deep mound near the eastern bank of the river. (Tr. Trans. at 105-106.) After the left swing went too far past the condos, Allen then put in right rudder to check the left swing although he had not yet received the "all-fast" call from Young. (Tr. Trans. at 99; 102; 130.)

---

[2] Because of Young's death and the absence of any eyewitnesses, the findings concerning Young's acts are based on the established facts and the logical inferences from those facts. (Tr. Trans. at 92; 101; 293.); see also Miller v. Phillip, 813 F. Supp. 2d 470, 477 (S.D.N.Y. 2011) (a fact finder is entitled to draw "reasonable, logical, proper, just inferences" from facts they had already found, but is not allowed to "speculate" or "jump beyond" the "logical extension" and "conclusion" of the facts); People v. Benzinger, 36 N.Y.2d 29, 32 (N.Y. 1974) (an inference must only be drawn from a proven fact or facts and then only if the inference flows naturally, reasonably and logically from the proven fact or facts, not if it is speculative).

After putting in right rudder, Allen began to notice loss of control of the Barge and Tug and saw the port push gear in the water (Tr. Trans. at 99; 101; 287), which indicated that the starboard push line was not taut. The Barge and Tug continued moving toward the east bank of the river, significantly off the current and swung upwards of 50° or more off the current.  (Tr. Trans. at 287.)

When Allen commenced the right turn and as the Tug's stern swung to port, the forces on the towline caused the line to start to pull off the capstan. Young started to radio Allen, and got entrapped in the towline after 20 feet had paid out. Two more turns of the capstan paid out as Young was squeezed to death and 30-50' of line paid out as the starboard line became slack, moving thereafter in response to the movements of the Tug and Barge.  (Tr. Trans. at 301; 314.)

Allen concluded that something had gone wrong on the aft deck and attempted several times to call Young on the radio but received no response.  (Tr. Trans. at 104; 151.)  Allen had no steering capability because the Tug and Barge were not tightly connected.  (JPTO 31; Tr. Trans. at 151-152; 155.)

19

Allen then rushed down to the aft deck.  (Tr. Trans. at 106;
156.)  It took Allen about sixty to ninety seconds to arrive
there from the wheelhouse.  (Exhibit 190 at 10 (referring to
Allen deposition testimony).)

        When Allen arrived on the port side of the aft deck,
he walked toward the capstan on the aft side of the H-bitt, and
noticed that turns of line had been removed from the H-bitt.
(Tr. Trans. at 107-9.)  He did not see Young as he walked toward
the area in between the H-bitt and capstan.  (Tr. Trans. at
109.)  The line between the H-bitt and the capstan was slack and
on the deck.  (Tr. Trans. at 110.)  Allen then walked directly
between the H-bitt and capstan over the towline.  (Tr. Trans. at
111.)  Allen did not see Young until he brushed up against him
and saw him caught in the capstan.  (Tr. Trans. at 109-110.)
Young's body was elevated off the deck and facing aft and his
head was on the forward portion of the capstan at the 12 o'clock
position.  (Tr. Trans. at 99; 110; Exhibits 6, 14.)  Allen then
left the aft deck to get Best and Staszko.  (Tr. Trans. at 112.)

        Best arrived on the port side of the aft deck and
proceeded behind the H-bitt and arrived at the capstan.  (Tr.
Trans. at 199-200.)  Staszko came down the starboard side.  (Tr.

                              20

Trans. at 1162.)  When Best arrived, he found the line between the capstan and the h-bitt was taut.  (Tr. Trans. at 202.)  He found Young's head on the port side of the capstan at the 7 o'clock position and Young's body was positioned at an angle, further to the port side than his lower body with his lower body at around 10 o'clock on the capstan.  (Tr. Trans. at 200-202.) Young's right arm and hand were tucked into his chest against the capstan and his left arm was hanging free and holding the radio microphone.  (Tr. Trans. at 110; 203.)  There were two wraps of rope around Young.  (Tr. Trans. at 207.)  After unwrapping the lines around Young, Staszko and Best lowered Young's body to the deck, being sure to "keep things the way they were the best [they] could."  (Tr. Trans. at 1163-1164.)

The crime scene photographs show Young's head position to the starboard side of his body, with his head located approximately at the 7-8 o'clock position.  (Exhibit 271.)  When Staszko and Best arrived at the aft deck, they saw that only a single figure-eight turn was around the h-bitt, that the line between the capstan and h-bitt was tight and that there was a full set of turns around the capstan.  (JPTO 34; Tr. Trans. at 205; 207; 233; 235; 1096; Stipulated Facts at ¶ 34.)

21

Best then activated the capstan to start pulling in the line in order to make up the Tug to the Barge again and recalled bringing in a "s--tload" of line. (Tr. Trans. at 212-14.)  The line was piling up so high that Best had to push it to starboard to keep it from falling onto Young's body. (Tr. Trans. at 214-15.)  Best first estimated that 30 feet of line had paid out, but when informed that 30 feet of line is approximately five or six revolutions of the capstan, Best responded "[w]ow, seemed more than that."  (Tr. Trans. at 217.)  Best affirmed his deposition testimony at trial, that "[I] felt - it seemed like a mile of line.  Seemed like . . . But I would say maybe close to 50 feet . . . .  Somewhere between 30 and 50 feet of line."  (Tr. Trans. at 219.)

During the process of lowering Young to the deck and retrieving the line, the Tug was drifting back and forth. (Tr. Trans. at 209-210.)

During the subsequent investigation that morning, the Tug was boarded by the New Jersey State Police, the New Jersey Regional Medical Examiner and the U.S. Coast Guard. (Tr. Trans. at 1098; 1100; *see, e.g.*, Exhibits 7; 8; 9; 186; 189.)  The capstan was tested in the presence of the Coast Guard, and it

was discovered that the capstan could not be operated in the reverse direction.  An engine room inspection by Best and the Coast Guard investigating officer confirmed that the capstan's reverse relay had overloaded and tripped out. (Tr. Trans. at 158; 1101-1102; 1301-1303; Exhibits 191, 194); (Tr. Trans. at 160; 234-235; 235; 1102; 1234-1238; 1310; 1320.)

Moran suggests that this resulted because Young incorrectly pressed the reverse button instead of the forward button when he initiated the capstan, and this was the cause of the line paying off and Young's subsequent death.  Yet, there is not any evidence presented as to a cause for the trip (also known as a "thermal overload"), since neither one turn of the line around the H-bitt nor Young's 200 pound body trapped in the capstan would provide necessary tension for an overload.  (Tr. Trans. at 307-308.)  Nor was a "hockle" or "asshole" found in the towline, which could have caused the overload that night. (Tr. Trans. at 223.)  Moreover, if the towline was slack after Young had been entrapped, as Allen testified, then the towline could not have caused the thermal overload to trip, since in order to trip the overload, there needed to be tension or load on the tailing side of the capstan.  (Tr. Trans. at 307-08.) The starboard gear would also have had to go slack first as the

23

line paid out in reverse, but Allen has no recollection of that,
only that the port gear went slack, which is consistent instead
with Claimant's theory of a pull off of the starboard push line
under great loading.  (Tr. Trans. at 104; 319.)

Further, during testing by Claimant's expert aboard
the Tug, the capstan would not stall, let alone trip the thermal
overload, with one or two turns on the H-bitt.  (Tr. Trans. at
289-290; Exhibit 309.)  In fact, Dr. David Tantrum ("Tantrum"),
Moran's expert, acknowledged that a line with one turn or one
and a half turns on the H-bitt would not cause the line to go
hard, as required by Moran's reverse button theory.   No
evidence was adduced indicating a cause for the line to go hard
to stall the capstan.  (Tr. Trans. at 71.)  Additionally, if
Young mistakenly operated the capstan in reverse and got caught
in the capstan rotating in reverse, "the only forces on Young
[would have been] the weight of the push gear and the resistance
offered by one figure eight on the h-bitt," which would yield
squeeze forces of approximately 3.5 to 6.7 PSI, not enough to
cause Young's crushing injuries.  (Tr. Trans. at 305; 318.)

Young's body positioning, in that he rotated in the
capstan from the 12 o'clock to the 7 o'clock position, also

24

precludes the theory that he accidentally hit the reverse

button.  (*Id.*)  Because the capstan turns (in both forward and

reverse) at approximately one foot per second, the capstan would

have to rotate for at least 30-50 seconds in order for 30-50

feet to pay out, during the last 10 seconds of which Young would

have been caught in the capstan.  (Tr. Trans. at 319-20.)  Young

would have had to watch 20-40 feet of towline pay out for 20-40

seconds without taking any corrective action for the Moran

theory to hold.  (Tr. Trans. at 253-54.)  The reverse mode on

the capstan was also hardly ever used and the thermal overload

could have occurred at any time prior to the morning of December

27, 2009.  (Tr. Trans. at 1166.)


After the initial investigation, on January 26, 2010,

the Occupational Safety and Health Administration ("OSHA")

conducted an inspection of the vessel and on March 31, 2010

issued a citation against Moran, alleging certain violations of

29 C.F.R. and the Occupational Safety and Health Act of 1970.

The citation stated that "[i]ssuance of this citation does not

constitute a finding that a violation of the Act has occurred

unless there is a failure to contest as provided for in the Act,

or if contested, unless this Citation is affirmed by the Review

Commission or Court." (Exhibit 167.)

25

Moran contested the citation, and it was later
withdrawn unilaterally by OSHA without any consideration by
Moran or agreement by Moran to perform any abatement. (*See*
Exhibits B, C, D, and E to Petitioner's Motion in Limine to
Exclude OSHA Citation.)

The Medical Examiner Alex Zhang ("Dr. Zhang") made the
following post mortem findings at autopsy. In terms of external
factors, Dr. Zhang determined that the line wrapped twice around
Young's torso compressing his right lower chest down toward the
left abdominal area, leaving pronounced ligature marks. (Exhibit
395 p. 24; 32.)  He determined that the head and chest showed
diffuse petechial hemorrhaging indicating blocked circulation
causing rupture of the small veins and capillaries. (Exhibit 395
p. 29-30.)

In terms of internal factors, Dr. Zhang found that
while certain abdominal organs were herniated downwards into the
scrotum, others, including the lacerated liver, were herniated
upwards through the tear in the diaphragm and into the right
pleural cavity, collapsing the right lung and pushing it into
the left pleural cavity. (Exhibit 395 p. 32.)  In addition, Dr.

26

Zhang determined that the massive pressure from the line
fractured twenty-one ribs, mostly on the right side, preventing
Young from even taking a breath. (Exhibit 395 p. 33.)  His
report also states that the lumbar vertebral body was separated
from the sacrum, (Exhibit 395 p.43), and that all five lumbar
transverse processes were fractured. (Exhibit 395 p. 43.)

        Dr. Zhang found that when the sacroiliac joint
separated, it transected or severed the abdominal aorta and vena
cava, the two major blood vessels in the body. (Exhibit 395 p.
42.)  Dr. Zhang concluded that Young's severe injuries resulted
in traumatic or mechanical asphyxia (inability to breathe)
causing his death. (Exhibit 395 p. 50-53, 68; Tr. Trans. at
820.)  Young lost all respiratory function, followed by
circulatory collapse. (Exhibit 395 p. 66.)  Once Young's oxygen
saturation dropped, he lost consciousness. (Exhibit 395 p. 58.)

        Based on the ligature marks and hemorrhaging, Dr.
Zhang further concluded that Young's heart continued pumping
while he was being constricted in the capstan line.  (Zhang Dep.
Tr. at 29-30.)  Dr. Zhang noted that Young had over 20 rib
fractures and also had a partially punctured lung as well as a
separated pelvis. (Zhang. Dep. Tr. at 33; 34; 39-43.)  These

27

injuries would have caused Young difficulty breathing, but he could still have taken in some oxygen while being compressed. (Zhang Dep. Tr. at 823.)  The capstan line functioned as a tourniquet, allowing blood to continue to circulate to Young's heart and brain while he was being compressed.  (Zhang Dep. Tr. at 44; 54; 56.)

Dr. Zhang noted that the petechial hemorrhages observed during the post-mortem examination indicated a squeezing of the body and a continued heartbeat.  (Tr. Trans. at 823; 826.)  While the heart continues to beat, it preferentially pumps blood to the brain so that the brain can continue to be oxygenated.  (Tr. Trans. at 824; 827.)  Based on the petechial hemorrhages, the location of the traumatic injuries and the absence of blood below the torso, Dr. Zhang concluded that Young was conscious for more than two minutes. (Zhang Dep. Tr. at 56-59; Tr. Trans. at 825-26; 829.)

Dr. Barbara Bollinger ("Dr. Bollinger"), Claimant's forensic pathology expert, also offered her opinion that Young had been able to remain conscious for at least two minutes following his entrapment. (Tr. Trans. at 828-829).  Dr. Bollinger based her conclusion that Young was conscious for two

28

to three minutes on the presence of petechial hemorrhaging, and cited a medical study entitled Asphyxial Deaths and Petechiae.

In contrast, Dr. Lone Thanning ("Dr. Thanning"), Petitioner's forensic pathology expert, concluded that Young had lost consciousness within ten seconds. (Tr. Trans. at 1515-1516). Dr. Thanning supported her testimony by opining that Young lost consciousness as the result of a neurogenic coma, caused by intense pain from his crushing injuries that were incompatible with conscious survival and evidenced by a lack of a vital reaction. (Tr. Trans. at 1541.) Dr. Thanning also maintained that the absence of significant blood in Young's pleural cavity, after twenty-one rib fractures, evidenced an instantaneous drop in blood pressure, with concurrent loss of consciousness. (Tr. Trans. at 1508-1509.) Dr. Thanning did not question the testimony of Dr. Zhang as to how much blood specifically was in the pleural cavity, other than to note his report which specified a few CCs. (Tr. Trans. at 1545-47.) Dr. Thanning subscribes to the Forensic Examiner, the Journal of Human Pathology, and the Journal of Investigative Laboratory methods. (Tr. Trans. at 1538.) At the time of his deposition, though, Dr. Thanning had not produced any medical journals, physical evidence from the autopsy, or other support for her

29

theory that vital reaction would begin to show within ten seconds or that pain alone would automatically cause a person to become unconscious.  (Tr. Trans. at 1543-45.) Dr. Thanning also had not read any study about the amount of compression a human body can sustain while remaining conscious.  (Tr. Trans. at 1544.)  Dr. Thanning acknowledged instead that everyone has a different unique threshold of pain, for instance one person may remain conscious during amputation while another may not, and that she was unaware of Young's personal pain threshold.  (Tr. Trans. at 1543-44.) In all of her times testifying about pain and suffering, Dr. Thanning could not recall ever testifying that the excruciating pain of crushing injuries was the precipitating factor of a neurogenic coma that would cause almost immediate loss of consciousness.  (Tr. Trans. at 1552.)

Based upon the credible testimony of Dr. Zhang and Dr. Bollinger, and the lack of support for Dr. Thanning's conclusions, Young remained conscious for at least two minutes after becoming entrapped in the capstan by the towline.

Experts also testified as to the holding and pulling forces that resulted in the paying out of the towline. The

credible evidence of the Claimant's expert, Eckhardt

("Eckhardt"), established the value of the competing forces.


The primary purpose of the capstan is to pull a load.

(Tr. Trans. at 291.)  When there are sufficient wraps around the

capstan and sufficient back tension on the tailing side, then it

can pull up to the limit of its horsepower, or in this case

5,500 pounds (consistent with a ten horsepower capstan).  (Tr.

Trans. at 291.)  The capstan has a resistant force heavily

dependent on the coefficient of friction of the type of rope

wrapped around it.  (Tr. Trans. at 293.)  When Young was found

on the capstan, there was one figure-eight turn on the h-bitt.

(Id.)  Based on the knowledge that the rope pulls off the

capstan with two turns on the h-bitt, the type of rope, and the

fact that the holding force was 5,5000 pounds, Bart Eckhardt

("Eckhardt"), Claimant's expert, applied a formula to determine

a range for the coefficient of friction of the rope.  (Id.)  He

determined that the coefficient of friction of the rope used was

between .19 and .22, but most likely closer to .19.  (Tr. Trans.

at 293; Exhibit 392.)  Additionally, the starboard towline ran

through a "four-part purchase" on its way from the Barge to the

capstan, which provides a four-to-one "mechanical advantage" of

the capstan.  (Tr. Trans. at 301-02; Exhibit 184, photo 28.)

31

With this information, Eckhardt calculated how much the capstan could hold with four turns and with five turns with the maximum back tension offered by one figure eight turn on the H-bitt. (*Id.*)  Accounting for the four-part makeup's increased holding power in his calculations, Eckhardt testified that the actual force exerted by the capstan, or what the capstan is capable of holding compared to what forces it is subjected to, is 5,5000 times four, or 22,000 pounds.  (Tr. Trans. at 302.)  Thus, if the forces exerted on the capstan by the current and the Barge were greater than 22,000 pounds, then the line would be able to pull off.  (Tr. Trans. at 299; Exhibit 90.)


        The current of the Hackensack River was flowing at 56 degrees true, and the reciprocal heading was 222 degrees true. (Tr. Trans. at 286; Exhibit 91.) The intended course of the Barge and Tug toward the Jacknife Bridge was 201 degrees true, or 21 degrees off the current.  (Tr. Trans. at 287; Exhibit 91.) During the first turn of the swing maneuver, the unit swung approximately five degrees to the right.  (Tr. Trans. at 721.) At that point, immediately prior to beginning the left (second) turn, the Barge and Tug were on an angle approximately five to ten degrees off the current.  (Tr. Trans. at 287; Exhibit 91.)

32

The Barge and Tug were at that angle for approximately 35-60 seconds. (Tr. Trans. at 94; 99.)  The unit was approximately 20 degrees off the current when on a line toward the bridge. (Tr. Trans. at 287; 298; Exhibits 5, 91.)  The unit was approximately 30 degrees off the current when it was on a line towards the condos. (Tr. Trans. at 298; Exhibits 5, 91.)  When Allen left to go to the aft deck after realizing something was wrong, the unit was at about 171 degrees true, no more than 50 degrees off the current. (Tr. Trans. at 287; Exhibits 5, 91.)  Allen recalled seeing the Barge and Tug swing past his line to the condos, indicating that he put in right rudder when the Tug and the Barge were more than 30 degrees off the current. (Tr. Trans. at 105.)

At 10 degrees off the current, the Barge and current were exerting approximately 39,000 pounds on the capstan. (Tr. Trans. at 299; Exhibit 85.)  At 20° off the current, the Barge and current were exerting approximately 81,000 pounds on the capstan. (Tr. Trans. at 299; Exhibit 86.)  At 30° off the current, the Barge and current were exerting approximately 170,000 pounds on the capstan. (Exhibit 89.) At 40° off the current, the Barge and current were exerting approximately 219,000 pounds on the capstan. (Exhibit 89.) At 50° off the

33

current, the Barge and current were exerting approximately

279,000 pounds on the capstan.  (Exhibit 89.)


Due to the 4-part purchase, each of the previous five

calculations must be divided by 4.  (Tr. Trans. at 305.)  Even

with this division, the "pulling forces" on the capstan were

greater than the "holding forces" at every 10˚ interval starting

at 20 degrees, or when at least 20,000 pounds of force from the

"pulling forces" (81,000 divided by four) were acting on a

capstan with four turns around it and with a conservative back-

tension approach.  (Tr. Trans. at 299-300; 305.)  At angles

beyond the line to the bridge, or approximately 21 degrees on,

the force was sufficient to pull the line off of the capstan.

(Tr. Trans. at 300.)  Assuming there were five turns around the

capstan, Eckhardt testified that under the conservative approach

(with maximum holding power on the H-bitt), the line would pay

off at 50˚ off the current.  (Tr. Trans. at 392.)  To ensure a

conservative assessment, the assumption that five turns were

around the capstan is adopted.


If there was slack between the H-bitt and the capstan

(as there would have been had Young been untying the wraps

around the capstan), the holding forces would drop considerably,

34

and the line would pay out at an angle off the current of less than 50˚. (Tr. Trans. at 392-93.)  The time it would take the unit to swing off the current to its position at 171 degrees true was approximately 45 seconds and, after Allen entered the final right rudder, it would take approximately 15-18 seconds for the line to pull off the capstan.  (Tr. Trans. at 301.) Thus, even with five turns on the capstan, the forces exerted on the capstan when Allen put in right rudder were enough to overcome the holding force of the capstan, or the 22,000 pounds, and cause the line to pull off.

Further, the 30-50 feet of line that pulled off was consistent with the angle of the Tug in relation to the Barge following the last right turn by Allen.  (Tr. Trans. at 315.) The 30-50 feet of line corresponds to a difference of approximately 10 feet in length between the front, right corner of the Barge (in relation to the Tug) and the right quarter h-bitt of the Tug, due to the four-part purchase.  (Tr. Trans. at 302-303; 315.)  For every 10 feet of separation between the front, right corner of the Barge and the Tug's right quarter bitts, 40 feet of rope will come off the capstan because of the four-to-one makeup of the push gear.

35

The physics and force calculations comported with the descriptions from the fact witnesses and establish that, to a reasonable degree of certainty, the towline pulled off the capstan as a result of Allen putting in right rudder to check the left swing before getting the "all fast" from Young, the capstan not yet being secure.  (Tr. Trans. at 327.)  Because there is no notch in the bow of the Barge in which the tow can be "embedded," the engagement of the Tug against the Barge "depend[s] purely on the tension of the lines."  (Tr. Trans. at 296.)  The calculations as to the resulting tension on the lines confirm the explanations advanced by the Claimant, as it shows that the forces were high enough when Allen turned at more than 30 degrees to pull the line off the capstan.  (Tr. Trans. at 293-94.)

Moran's expert, Tantrum, in turn calculated that there was not enough force exerted for the line to pull off the capstan.  Tantrum acknowledged that his calculation of the coefficient of friction was incorrect based on using the wrong type of rope, and that Eckhardt's calculations were correct as to this number, but with respect to the overall calculations, accounting for the four-part purchase, Tantrum testified that there was only 3,437 lbs acting on the capstan.  (Tr. Trans. at

43-44.)  Because the holding force of the capstan is 22,000 lbs, the capstan would be able to hold the load and the line would not pull off.

Tantrum's theory is precluded by the facts as testified to by the eye witnesses and by the specific circumstances of the accident.

Tantrum, unlike Eckhardt, did not base his calculations on the medical evidence establishing Young's injuries.  (Tr. Trans. at 55.)  The medical evidence shows that the Young's injuries are only possible as a result of the forces present in Claimant's theory.  (Tr. Trans. at 56.)  The squeeze force under Tantrum's pay out theory, in contrast, is not sufficient to cause Young's crushing injuries.  (Tr. Trans. at 319.)  Tantrum testified that he did not investigate or look into whether this medical evidence was accurate, or whether his theory could possibly create the injuries that Young suffered. (Tr. Trans. at 55-56.)

Tantrum's theory also does not comport with the established facts of Young's body positioning and the slack in the line at the time of Young's death.  Allen testified that

37

when he found Young's body, the line was slack, with at least
some 30-50 feet of line on the ground, which he had to walk over
to reach Young. (Tr. Trans. at 51.) Tantrum's calculations are
based on the line being taut. (Tr. Trans. at 52.)  If the line
was slack, as Allen testified, Tantrum admitted that his theory
does not hold and cannot account for the some 30-50 feet of line
found at Young's death.  (Tr. Trans. at 56-57.)  Tantrum's
theory likewise discounts the testimony of Allen, Best and
Staszko, that Young was facing starboard when he was found, and
that his body rotated in the capstan from a 12 o'clock position
to an 8 o'clock position, bringing the line from slack to taut.
(Tr. Trans. at 53.)  If Young's body did rotate, as all three
eye witnesses testify to, Tantrum acknowledges that his theory
fails.  (*Id.*)


In addition, Tantrum's calculations relating to the
four part purchase fail to take into account the specific
circumstances affecting the force on the lines and the capstan
at the time of Young's death.  (Tr. Trans. at 48.) Tantrum
opined that the four part make up would reduce the load at the
capstan as opposed to the line on the barge, which would be F-
barge.  (*Id.*)  The force of F-barge was calculated as the thrust
of 10,000 pounds by a moment arm of 4, or 44 by 10,000, which

would make the F-barge 32,000 by the line on the barge.  (Tr.
Trans. at 49.)  At this point, Tantrum explained that the sum of
the moments equals zero, as the 44,000 multiplied by 10,000
should be equal to 32 feet, which is the moment arm by F-barge,
or a load of 13,750.  (*Id.*)  F-barge, or the 13,750 calculated
by Tantrum, is the force that would be in a single line.  (Tr.
Trans. at 50; 436.)  Since the force on the capstan goes through
the four part lineup, Tantrum then divided the 13,750 by four to
get 3,437 pounds.  (Tr. Trans. at 49.)  Because the holding
force of the capstan is about 22,000 pounds, as agreed to by
both Tantrum and Eckhardt, with Tantrum's calculations, this
3,437 pounds would not be enough for the line to pull off the
capstan or for Claimant's theory to hold.  (Tr. Trans. at 49-
50.)

    These calculations relating to the four part purchase
are from the perspective of the corner of the Barge, not the
capstan, and do not factor in the outside forces acting on the
capstan at the time of Young's death.  (Tr. Trans. at 69.)  The
13,750 lbs calculation assumes the Tug and Barge are balanced
under a perfectly executed swing maneuver where the capstan is
secure.  (Tr. Trans. at 437.)  The 13,750 lbs at F-barge does
not take into account the influence of the current or the forces

39

acting on the Tug when Allen initiated right rudder over 10

degrees off of the current, creating additional current forces

as the Tug tried to pivot the Barge the opposite direction.  (Tr

Trans. at 442.) Under these circumstances, and when calculating

F-barge from the perspective of the what force would be required

to pull the line off the capstan, the F-barge force, even

accounting for the four part purchase, is 55,000 pounds.  (Tr.

Trans. at 430).  Tantrum admitted that if he assumed that the

13,750 pounds was at the capstan, or looked at the equilibrium

calculation from the point of view of the capstan, then

multiplying through the four part series, there would be

approximately 55,000 pounds at the corner of the barge, which

would be enough to pull the line off the capstan.  (Tr. Trans.

at 69-70.)  This calculation of F-barge as 55,000 pounds

comports with the facts as testified to regarding Young's body

placement and the slack in the rope, and the injuries that Young

sustained.


        Further, Tantrum's calculations are based on numbers

calculated by Rick van Hemmen ("van Hemmen"), also a Moran

expert in this case.  (Tr. Trans. at 66.)  Van Hemmen opined

that when the tug rotated from a 12 o'clock position against the

Barge to a 45-degree position as the line moved out, you would

40

only see 10 feet.  (Tr. Trans. at 68.)  However, this figure

fails to calculate in the four part purchase, which would cause

the 10 feet to translate into 40 feet of line.  (*Id.*)  Tantrum

agreed that this was incorrect.  (*Id.*)  Tantrum's theory also

rests on the assumption that Young hit the reverse button of the

capstan.  (Tr. Trans. at 57-58; 71-72.)  The facts as found

above preclude this assumption.

In addition to Tantrum's calculations, Moran also

introduced a video simulation to show that the capstan can hold

the line with four or five turns under the normal circumstances

of a swing maneuver.  (Tr. Trans. at 47.)  This video, though,

fails to duplicate the specific circumstances the night of the

incident that contributed to Young's death.  Specifically, the

video does not document the Tug swinging left too far past the

intended course, or Allen attempting to correct this error by

putting in the right rudder too early and before he had received

the "all-fast" from Young, resulting in Allen noticing a loss of

control of the Barge and the Tug.  (Tr. Trans. at 99; 101; 287.)

Claimant's video was based on the facts on the evening

of Young's death as testified to by both Best and Allen.  (Tr.

Trans. at 27-32.)  Claimant's video showed that Allen did not

41

swing the Tug to the right far enough initially; that the Tug then began swinging left earlier than normal; that Allen saw the lights dim as he swung left and knew that meant that Young had operated the capstan; that Allen continued swinging left but became concerned it was too far left; that he then turned the right rudder to correct this before he received an all-fast from Young; that at this point, he noticed a loss of control as the line began pulling out (as shown in the animation); and the pivot of the Tug against the Barge as Allen lost control, given that Young had not had enough time to finish loading the h-bitt, caused the line to pull off the capstan and Young to get ensnared. (Tr. Trans. at 29-30.) Claimant's video demonstrated the difference between these specific events and that of a properly timed swing maneuver, where the capstan can, as Moran shows, hold the line. (Tr. Trans. at 30.) The video indicated that on the night in question, the initial turn did not go far enough right, leaving less time to swing left. (*Id.*) Once the Tug swung left, the slack developed, and there was not enough time for Young to finish the procedure to secure the slack. (Tr. Trans. at 30-31.) Best found only one turn on the h-bitt when he arrived. (*Id.*) Because there was only one turn on the h-bitt, the forces entered the push gear and caused the line to pull out. (Tr. Trans. at 30). In contrast, in a normally and

42

correctly executed swing maneuver, as shown in Moran's video,
the deckhand, would have had time to finish making fast the h-
bitt before the final right turn, and this would prevent the
line from pulling out and allow the capstan to hold the line.
(*Id.*)  While Moran did show that a swing maneuver can be
executed without accident under normal circumstances.
Claimant's video, which took into account the relevant facts as
testified to by Best and Allen, is therefore credited.

With respect to safety precautions and guidelines,
Moran's OPPM is the manual in which Moran lists the "procedures
that Moran uses." (Tr. Trans. at 1398; Exhibit 313.)  Moran's
Vice President of New York and Offshore Operations Peter Keyes
("Keyes") is responsible for the OPPM.  (Tr. Trans. at 1398.)
The OPPM contains certain written instructions and procedures
governing kitchen operations, such as using an oven glove to
handle a hot pot and how to safely put away knives in the
dishwasher, but contains no instructions with respect to line
handling or the swing maneuver. (Tr. Trans. at 1406 (there is
"nothing in the OPPM about the swing maneuver.").)

Moran also adheres to the International Safety
Management Code ("ISM Code"), even though it does not have a

43

certificate of compliance for the Tug under the ISM, (Tr. Trans. at 1399-1400; Exhibit 305), and the Responsible Carrier Program ("RCP"). (Tr. Trans. at 1399.)

The ISM Code requires that for shipboard operations, "the company should establish procedures, plans and instructions, including checklists as appropriate, for key shipboard operations concerning the safety of the personnel." (Tr. Trans. at 1400.) Moran did not have a risk assessment for a swing maneuver and did not view a swing maneuver as a "key shipboard operation." (Tr. Trans. at 1404.) The ISM Code also requires that Moran "assess all identified risks to its ships [and] personnel." (Tr. Trans. at 1402; Exhibit 305.) A job hazard analysis would list the following: (1) the steps to complete the task; (2) the hazards that might arise if the operation goes wrong; and (3) the precautionary measures needed to mitigate the risks. (Tr. Trans. at 629, 642.) Moran did not employ a job hazard analysis for line handling including the swing maneuver, despite the fact that the swing maneuver conducted by Moran is the type of operation that is amenable to a job hazard analysis because it is a task that involves a capstan that comes under heavy load and strain. (Tr. Trans. at 624; 640.)

44

The RCP requires companies such as Moran to "establish documented procedures for the safe use of wires, ropes, chains, shackles, ratchets and winches." (Tr. Trans. 1400; Exhibit 399.)  The capstan is a type of winch, yet no such procedures regarding the capstan are established by Moran. (Tr. Trans. at 605.)

Moran also has a duty to identify topics that raise safety concerns, and require its captains and employees to address these issues and train for them. (Tr. Trans. at 1405.) These safety topics are identified and submitted to captains in the form of "Port Advisories" and "Port Specific Operational Guidelines," and then the captains discuss these topics with their crews during monthly safety meetings. (Tr. Trans. at 1136; 1407-1408; Exhibits 177, 178.)  Moran management provides its captains with safety topics that must be covered, and the captains then cover those topics with their crew. (Tr. Trans. at 1144.)  Moran did have written procedures for other types of maneuvers, such as the retrieval of a lost barge. (Tr. Trans. at 1406.)  None of the Port Advisories issued by Moran to its captains prior to December 27, 2009, covered "safety

45

procedures." (Tr. Trans. at 1405-1406; Exhibit 178.)   The
safety meetings conducted by Captain Staszko in accordance with
Moran's directives in the year prior to Young's death did not
cover any safety concerns.  (Tr. Trans. at 1137-1138; Exhibit
258.)  No Port Advisory concerned line-handling generally or
capstan operations specifically.  Further, the safety topics in
the year preceding Young's death never covered capstan
operations.  (Tr. Trans. at 1046-1047; Exhibits 178, 258.)

Moran also did not have written procedures instructing
the mate or captain at the controls during a swing maneuver that
it was necessary to wait for an "all fast" call before coming
back right.  (Tr. Trans. at 713, 1412.)  It is essential to have
"positive communications" throughout the entire swing maneuver
because deckhands are responsible for lines under strain, and
the line must be secure before the maneuver can proceed.  (Tr.
Trans. at 642; 713; 715.)  Otherwise the gear could slip out and
subject crewmembers on deck to fatal hazards.  (Tr. Trans. at
632; 643.)

In addition to a lack of guidelines and safety
procedures, swing maneuvers and swing gear in general are
antiquated, and most tugboat companies have replaced boats using

46

the swing maneuver with "safer, more rugged, more reliable
methods, which using sheaves and a tow drum is a lot stronger."
(Tr. Trans. at 640.)  Moran is thus part of the minority of
tugboat companies that still employ the swing maneuver.

Moran was aware of at least seven incidents prior to
Young's death where Moran employees were injured during capstan
operations.  (Tr. Trans. at 1417-1419.)  Moran was also aware of
a 2005 incident in which a deckhand from another tugboat
company, K-Sea, got crushed in a capstan aboard the tug Davis
Sea while handling lines.  (Tr. Trans. at 1419-1420.)  After
that incident, Moran still did not issue any Port Advisory or
change in any way the manner in which tasks involving lines and
capstans, including the swing maneuver, were trained for or
conducted.  (Tr. Trans. at 1402-1421.)

With respect to the equipment used on the Tug, the
triangular area between the capstan, h-bitt and capstan
controller created a "danger zone" in which Young worked.  (Tr.
Trans. at 328; Exhibit 384, photos 3, 6.)  On several other
Moran and other company tugs, the controllers were up to 6-7
feet away from the capstans.  (Tr. Trans. at 558-61.)  OSHA

47

investigated the Tug following Young's death and cited Moran for furnishing Young with an unsafe workspace, in violation of 29 CFR 1910.212, specifically section 5(a)(1) of the Occupational Safety and Health Act of 1970. (Tr. Trans. at 330; Exhibit 167.)  OSHA stated that the deckhand "operated an electrically powered capstan that had no guarding to prevent the employee from being pulled into the nip point." (Exhibit 167.)  After Young's death, the capstan controller was relocated to an area behind the H-bitt, thereby allowing a deckhand to work outside of the danger zone.  (Tr. Trans. at 225; 336; Exhibit 390, photo 20.)


Regarding Young's personal life and financial circumstances, Young supported a family financially dependent on him.  He was married to Avril Young.  The two met as teenagers and were married three years later, in 1972.  (Tr. Trans. at 902-03.) Though Avril had a son from a prior relationship, this was the first marriage for both Avril and the Decedent.  (Tr. Trans. at 903.)  They were a close couple, friends as well as spouses, talking by phone every day that Young was on the Tug. (Tr. Trans. at 72; 930.)

48

Soon after marrying, in the fall of 1972, Avril gave birth to Young's daughter, Sheila. From the time Sheila was a young child, she and Young were very close, Young cooked for Sheila and Don, Avril's son, helped with the house work and shared parenting responsibilities with Avril. (Tr. Trans. at 904-05.) Sheila suffered from seizures as a baby and when she started school the Youngs discovered that she had learning disabilities. (Tr. Trans. at 907.) Sheila was sent to a school for children with special needs when she was between 10 and 12 years old. (Tr. Trans. at 907.) She did not graduate from high school, nor has she ever held a job. (Tr. Trans. at 911; 988.) Sheila has a daughter, Katelyn Rebecca, Young's only grandchild, – who is almost five years old. (Tr. Trans. at 987.)

Avril moved to the United States in 1996. (Tr. Trans. at 905.) Before Young joined her here, the two spoke on the telephone and Avril would visit him in Guyana every year. (Tr. Trans. at 940.) While Avril lived in the United States, Young lived in Guyana with Avril's sister. (Tr. Trans. at 940; 943.) During this time, Young had a child, Nicholas Young ("Nicholas"), with another woman, Carol McDonald ("McDonald"). (Tr. Trans. at 913.) Nicholas was born on January 25, 1997. (Tr. Trans. at 913.) Though Young continued to maintain contact

49

with McDonald, he and Avril never contemplated divorce. (Tr.
Trans. at 929; 943; 983.)

Young followed his wife Avril to the United States,
legally immigrating, in 1999. (Tr. Trans. at 906.) He became a
naturalized citizen five years later. (Tr. Trans. at 910.) He
gained sole custody of Nicholas as of March 31, 2003. (Tr.
Trans. at 914.) Because Nicholas's mother was not able to
financially support him and had moved from Guyana for work,
leaving Nicholas to live with various family members, Young
moved Nicholas to the United States. (Tr. Trans. at 917.)
After arriving in New York in the fall of 2007, Nicholas lived
with his aunt, a school teacher, and uncle in South Carolina for
about seven months because the Youngs could not afford childcare
for the hours when Avril was working nights and Young was on the
Tug. (Tr. Trans. at 916; 948; 982; 1116.) Nicholas
subsequently moved in with Young and Avril. (*Id.*)

According to Nicholas and Avril, Young was a loving,
caring, attentive parent to Nicholas. (Tr. Trans. at 918; 1688.)
Even when Nicholas and Young were geographically separated,
Young made sure to keep in touch with visits and frequent
telephone calls. (Tr. Trans. at 919.) The two would speak every

50

day and sometimes even twice a day.  (Tr. Trans. at 919.)  They
would barbecue and play sports together, including baseball and
basketball. (Tr. Trans. at 919; 1010.)  Young helped Nicholas
with his homework, enlisting the aid of his co-workers on
occasion. (Tr. Trans. at 239; 919.)  Young took Nicholas to the
Tug to show his son where he worked.  (Tr. Trans. at 1015.) The
two talked about girls, and Young was teaching Nicholas how to
cook.  (Tr. Trans. at 1010-1012.)  Young picked Nicholas up from
school. (Tr. Trans. at 1010.)  He also bought Nicholas's
clothing and school supplies. (*Id.*)

Prior to Young's death, Nicholas had school marks in
the 80s.  (Tr. Trans. at 920.)   After his father's death,
Nicholas's grades slipped into the 60s, he had his first school
fight, he began to act withdrawn and he stopped playing sports.
(Tr. Trans. at 920; 921; 1011; 1012.)  Nicholas has no one that
has been able to replace the important role Young played in his
life.  (Tr. Trans. at 1012.)

In September 2008, Young purchased a studio apartment
in Queens as an investment property.  (Tr. Trans. at 955; 956;
998; 999.)  While Avril did not approve of the investment, she
loaned him money for the down payment.  (Tr. Trans. at 950.)

51

Though the couple's accountant claimed tax credits and
deductions for the property, Young never lived there.  (Tr.
Trans. at 927; 955; 956; 979-982; 999.) Even after Young's
death, the couple's accountant claimed the mortgage tax
deduction on Avril's tax return.  (Tr. Trans. at 981.)  After
purchasing the studio apartment, Young learned of an owner
residency requirement that prevented him from renting it out
immediately.  (Tr. Trans. at 999.)

     Up and until the time of his death, Young and Avril
lived together at 58-03 Calloway Street in Queens.  (Tr. Trans.
at 997; 1013.)  The Youngs shared the costs of their household
equally, despite having separate banking and credit card
accounts.  (Tr. Trans. at 975; 998.)  As for living expenses,
Avril and Young alternated months, with each of them covering
household costs every other month.  (Tr. Trans. at 975; 998.)
The two always filed joint tax returns with a "married" filing
status.  (Tr. Trans. at 979.)  Young did most of the cooking,
making extra food and freezing it for those weeks when he was on
the Tug.  (Tr. Trans. at 925.)   He also did the cleaning and
all childcare work for the two weeks a month when he was off the
Tug.  (Tr. Trans. at 925; 926; 963.)  Nicholas's expenses,
including clothing and sports equipment, were all paid for by

52

Young.  (Tr. Trans. at 924.) Young also payed for household
expenses such as groceries, clothing for Nicholas and restaurant
dinners both on credit cards and with cash.  (Tr. Trans. at
977.)

        Prior to Young's death, Nicholas was on Moran's health
insurance policy. (Tr. Trans. at 965.)  Young's insurance
received through Moran included a 401(k) retirement account and
pension contributions from the company. (Tr. Trans. at 965;
1435.)  Additionally, Avril was eligible to receive health care
benefits through the Moran policy.  (Tr. Trans. at 1487.)
Young's adult daughter Sheila may have been eligible to receive
those benefits, as well. (Tr. Trans. at 1487.)  Following
Young's death, no one in his family was eligible to receive
those benefits any longer.  (Tr. Trans. at 965; 1462; 1487.)

        Young had no expensive personal habits.  (Tr. Trans.
at 976; 1438.)  Before Young moved to the United States, he sent
money back to Guyana to help support Nicholas. (Tr. Trans. at
952.)  The amount varied, but was usually a few hundred dollars
per month. (Tr. Trans. at 952.)  Also, because of their
daughter's intellectual disabilities, both Youngs financially
supported Sheila. (Tr. Trans. at 911; 959; 989.)  They sent

                                53

between two and five hundred dollars to Sheila every month. (Tr. Trans. at 912; 959; 990.)  They sent the funds via MoneyGram, discarding the receipt once they had confirmed that the money had arrived in Guyana.  (Tr. Trans. at 960.)  Young also sent Sheila household goods, clothing, non-perishable foods and other necessities. (Tr. Trans. at 911; 912; 925; 990.)  Young bought clothing for his granddaughter, as well.  (Tr. Trans. at 925.)

Following Young's death, and with Sheila living in the United States, Avril has taken on sole responsibility for supporting Sheila, who currently lives on Calloway Street, and for the care of Sheila's four-year-old daughter.  (Tr. Trans. at 983.)  Avril also has sole responsibility for Nicholas's care. (*Id.*)

Claimant's expert Craig Moore, Ph.D., ("Dr. Moore") was a chaired faculty member of the University of Massachusetts for over 30 years, where he taught economics, statistics and finance and has published extensively in the fields of econometric modeling and statistics. (Tr. Trans. at 1427-28.) He was the recipient of numerous awards, including a university chancellor's award for his research and was an entirely credible witness.  (Tr. Trans. at 1429.)

54

Dr. Moore calculated that had Young lived and
continued to work until age 70, the economic losses incurred as
a result of his death would be at least $692,235. (Tr. Trans.
at 1440.)  He used the age of 70 in part because (a) a Moran
corporate representative testified that deckhands work into
their late 60s (and at least one was 70); (b) Young had worked
previously in less labor-intensive fields and thus had an
established work history in other areas; and (c) of the
demographic shift of individuals living longer and, thus,
working longer. (Tr. Trans. at 1436; 1484.)  Dr. Moore also
calculated the value of the services provided by a typical
working father in a three-person household between the ages of
59, Young's age when he died, and age 75. (Tr. Trans. at 1442.)
The figure that Dr. Moore calculated for lost household services
was $80,280. (Exhibit 261, 6.)

Had Young lived beyond age 75, the loss of household
services value would have been higher. (Tr. Trans. at 1443.)
Also, the loss of household services figure did not take into
account the actual work that Young provided to his household,
such as childcare, cooking, shopping and cleaning. (Tr. Trans.
at 1442.)  The figures that Dr. Moore calculated were further

55

discounted to present value based on the United States
Department of Treasury bond rates as of November 2011.  (Tr.
Trans. at 1439; 1443.)   Had he used bond rates applicable at
the time of trial, the economic losses would have been higher.
(Tr. Trans. at 1439; 1443.)

      Moran's economic expert, Thomas Fitzgerald, Ph.D.,
("Dr. Fitzgerald"), did not provide any mathematical
calculations or include any description of the methodology he
used in calculating his economic loss figure.  (Tr. Trans. at
1647; 1654.)   Further, he did not "indicate what [the] deduction
[for personal consumption] would have been" and did not object
to Dr. Moore's personal consumption calculation.  (*Id.*)  Dr.
Fitzgerald's calculations assumed that Young maintained two
households and also calculated lost support that omitted the
fact that Young had sole custody of his minor child and assumed
that Nicholas had health care benefits through his step-mother
and therefore attributed no pecuniary value to the loss of
Moran's health care benefits.  (Tr. Trans. at 1638.)
Additionally, he employed a non-existent Treasury bond rate when
reducing the economic loss to present value.  (Tr. Trans. at
1666-1667.)  Accordingly, Claimant's expert calculations are
adopted as more credible and reliable.

**Conclusions of Law**

The facts establish both required elements of liability in this case.  First, Claimant has established that Moran is liable under both the general maritime law for unseawothiness and for negligence under the Jones Act.  Second, Moran had failed to prove a lack privity or knowledge of the fault that killed Young and should, therefore, not be exonerated from or limited in its liability under 46 U.S.C. § 30505.

I. **Under General Maritime Law Unseaworthiness Has Been Established**

   *A. The Applicable Standard*

The United States Supreme Court has transformed the "warranty of seaworthiness into a strict liability obligation." Gilmore & Black, *supra*, at 384, 386; *see also Miles v. Apex Marine Corp.*, 498 U.S. 19, 25 (1990).  A shipowner "owes an absolute and non-delegable duty to seamen . . . properly aboard its vessel to provide a seaworthy ship. Although it has no obligation to provide an accident free vessel, the shipowner does have a duty to furnish a vessel and appurtenances reasonably fit for their intended use." *Pellegrino v. A. H. Bull*

57

*S. S. Co.*, 309 F. Supp. 839, 842 (S.D.N.Y. 1969) (citations omitted). "The standard is not perfection, but reasonable fitness." *Pellegrino*, 309 F. Supp. at 842. A shipowner is nonetheless liable for an unseaworthy tug "irrespective of fault and irrespective of the intervening negligence of crew members." *Miles*, 498 U.S. at 25.

"A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 517-18 (1971). A failure of a shipowner to implement adequate training and policies also renders a vessel unseaworthy. *Bonefont v. Valdez Tankships*, 136 F.3d 137, 1998WL 3029, *5 (5th Cir. Jan. 9, 1998) ("A finding that . . . the crew was inadequate or ill-trained for the task they were assigned represents a classic example of unseaworthiness"); *see Harrington v. Atlantic Sounding Co., Inc.* --- F. Supp. 2d ----, 2013 WL 94815, *7 (E.D.N.Y., January 7, 2013) (finding Jones Act negligence and general maritime law unseaworthiness where employer "provided no instruction or training to its crew as to how best to perform the [maritime] task [at hand]. . ."); *see also In re Complaint of Sea Wolf*

58

*Marine Towing & Transp., Inc.*, 2007 WL 3340931 (S.D.N.Y. Nov. 6, 2007) (same).  A shipowner will thus be liable if it failed "to provide an adequate training program for the crew" and that failure "proximately contributed to the" incident.  *Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1565-66 (11th Cir. 1985); *see also Sea Wolf*, 2007 WL 3340931, *2.

### B. Unseaworthiness for Lack of Training and Procedures Has Been Established

As the facts found above establish, Moran failed to adequately implement any procedures or guidelines that would provide its crew with the requisite training, skill and knowledge to safely perform a swing maneuver, operate the capstan or handle towlines. *Sea Wolf*, 2007 WL 3340931, *2 (holding that a shipowner's failure to provide an adequate training program for its crew constituted liability under general maritime law).  In fact, Moran issued no policies as to line-handling whatsoever, including ongoing training or standards for handling a line under strain.  Additionally, Moran did not provide a safe work environment in which to handle the capstan, forcing Young to operate in a danger zone.  These failures proximately contributed to Young's death.

59

Moran also failed to provide any written policies or safety procedures regarding the swing maneuver as required under the ISM and RCP.  Moran adheres to the ISM and the RCP, which respectively require that "the company should establish procedures, plans and instructions, including checklists as appropriate, for key shipboard operations concerning the safety of the personnel" and "establish documented procedures for the use of . . . winches."  (Tr. Trans. at 400; Exhibit 399.)  The capstan is a type of winch, and line-handling is arguably the most important "shipboard operation."  (Tr. Trans. at 605.)  Despite subscribing to these safety requirements, Moran did not have any written guidelines, instructions or procedures whatsoever for line handling during swing maneuvers or capstan operations.  (Tr. Trans. at 1398.)  Moran did not have a risk assessment for a swing maneuver or handling lines under pressure, or safety procedures for capstan operations in any of its Port Advisories or safety meetings, or require its captains and crews to dedicate time during the safety meetings to discuss or practice the swing maneuver or capstan operations for lines under strain.  (*Id.*)  Additionally, Moran's OPPM contains no instructions with respect to line handling or the swing

maneuver.  (Tr. Trans. at 1406 (there is "nothing in the OPPM
about the swing maneuver.").)

Accidents involving the capstan and line-handling were
foreseeable.  Moran had knowledge of at least seven incidents
prior to Young's death where its employees were injured during
capstan operations.  (Tr. Trans. at 1419-1420.) Moran also had
knowledge of a 2005 accident in which a deckhand from another
tugboat company, K-Sea, got crushed in a capstan aboard the tug
Davis Sea while handling lines.  (*Id.*)  Despite this knowledge,
and despite safety requirements, Moran did not issue any Port
Advisory or change in any way its policies or procedures for how
line-handling tasks, including the swing maneuver, were
conducted.  *See Hall v. E.I. Du Pont de Nemours & Co.*, 345 F.
Supp. 353 (E.D.N.Y. 1972) (threshold test of the applicability
of reasonable care "is not of the balance of probabilities, but
of the existence of some probability of sufficient moment to
induce action to avoid it on the part of a reasonable mind.");
(Tr. Trans. at 1420-1421.)  Young's death was thus not the
result of navigational errors or one time negligence, as Moran
posits, but a consequence of Moran's failure to ensure adequate
procedures for handling a line under strain, which had been
documented as potentially fatally dangerous.

61

In addition, because Moran had no guidelines or established procedures regarding the swing maneuver, Moran failed to instruct its crew as to the importance of communicating the "all-fast" before placing load on the line with the right rudder. (Tr. Trans. at 713; 1412.) As testified to by Claimants' experts, it is essential to have "positive communications" throughout the entire swing maneuver because deckhands are working with lines under strain, and the line must be secure before the maneuver can proceed. (Tr. Trans. at 642; 713; 715.) Otherwise the gear could slip out and subject crewmembers on deck to fatal hazards. (Tr. Trans. at 632; 643.) Allen testified instead that based on his years of work and training at Moran, that he believed the capstan would always "hold the load." (Tr. Trans. at 116.) He thus did not consider the consequences of instituting right rudder before he received the "all-fast" from Young.[3] To the contrary, in this instance,

---

[3] These facts also preclude Moran's contention that the "sudden emergency doctrine" was at play and relieves Allen and Moran of liability. The "sudden emergency doctrine" applies "only to circumstances where an actor is confronted by a sudden and unforeseen occurrence *not of the actor's own making* . . . [and] does not apply to situation[s] where [] the defendant [] should reasonably have anticipated and been prepared to deal with the situation with which [he] was confronted." *Krynski v. Chase*, 707 F. Supp. 2d 318, 325 (E.D.N.Y. 2009) (quotations omitted) (emphasis added). Here, Allen turning too far left and being forced to put in right rudder to correct the Tug and Barge from swinging past the intended course was of his "own making." *See id.* In addition, Allen should have reasonably been aware, and Moran had a duty to train its employees, that under these conditions, putting in right

62

the physics and calculations comported with the descriptions

from the fact witnesses establish that, to a reasonable degree

of certainty, the towline pulled off the capstan as a result of

Allen putting in right rudder to check the left swing before

getting the "all-fast" from Young and before the capstan was

secure.  (Tr. Trans. at 327.)  Moran's failure to institute

these policies and safety precautions, and Allen's subsequent

failure to get the "all-fast" before turning back right,

therefore directly contributed to Young's death.


        Moran also failed to ensure a safe location for the

capstan controller, creating a "danger zone" in which Young was

forced to operate. A vessel is unseaworthy if its equipment is

positioned in a way that makes that equipment unsafe. *Buckley*

*v. Cnty. Of Suffolk*, 2013 WL 122972, at *2 (E.D.N.Y. Jan. 9,

2013) (citing *Crumady v. The Joachim Hendrik Fisser*, 358 U.S.

423 (1959)); *Oxley v. City of New York*, 923 F.2d 22, 25 (2d Cir.

---

rudder before the capstan was secure could cause the line to pull off of the
capstan.  Allen thus should have been trained to anticipate and deal with
this situation, for instance by ensuring communication with Young before he
put in right rudder.  Moran's assertion that this was a "sudden emergency"
for which Allan was unprepared only confirms that Moran's training was
inadequate and establishes unseaworthiness, as Allen was unaware of the
potential consequences of putting in right rudder before the "all-fast." *See*
*Sea Wolf*, 2007 WL 3340931, *2 (holding that a shipowner's failure to provide
an adequate training program for its crew constituted liability under general
maritime law).

63

1991) ("A ship is considered to be unseaworthy when it is
insufficiently or defectively equipped.").

The Tug's capstan controller was located only 36
inches from the capstan and positioned in such a location as to
create a "danger zone" between the controller, capstan and H-
bitt where deckhands had to work. (Tr. Trans. at 328; Trial
Exhibit 384, photos 3, 6.)  OSHA stated that this positioning
forced the deckhand to "operate[] an electrically powered
capstan that had no guarding to prevent the employee from being
pulled into the nip point." (Exhibit 167.)

Moran had the authority and control over the equipment
of the Tug to create a safer working environment, but had not
done so at the time of Young's death. (Tr. Trans. at 1412.)  On
other tugs, including those owned by Moran, the distance between
the capstan controller and the capstan was significantly more
than 36 inches, averaging up to six or seven feet away, which
created a safe space for deckhands to operate in. (Tr. Trans.
at 558-61.)  On the Tug, in contrast, the controller location
forced Young to work in close proximity to the capstan, even
when tying or untying the towline off the h-bitt, placing him
dangerously near the nip point, where he was ultimately

64

ensnared.[4]  (Tr. Trans. at 328; 336.)  Moran's failure to place

its equipment appropriately thus also directly contributed to

Young's death.

Because of Moran's deficiencies as found above, the

Tug was rendered unseaworthy and Moran is strictly liable under

general maritime law for Young's death and the resulting

damages.

## II.  __Negligence Under the Jones Act Has Been Established__

*A. The Applicable Standard*

In order to prevail on a Jones Act claim, 46 U.S.C.

§ 30104, a plaintiff must prove by a preponderance of evidence

(1) that the decedent was acting in the course of his employment

(2) that the defendant was decedent's employer (3) that the

---

[4] Claimant's experts, Glenn R. Hibbard ("Hibbard") and Richard Bates ("Bates"),
both testified as to the critical importance of having two crewmembers on
deck during a swing maneuver, one to serve as a safety observer and one to
work the lines.  (Tr. Trans. at 655; 710.)  However, because there is no
evidence that industry standard required the use of two men operating during
a swing maneuver this testimony is discounted.  It is worth noting, though,
that in these particular circumstance, the combination of the danger zone
that Young was forced to operate in, and the lack of a second deckhand to
operate the capstan controller and act as a safety observer, did proximately
contribute to Young's death.  With a second deckhand present, Young would not
have had to operate near the nip point where the towline came off the
capstan, and the second deckhand could have communicated with Allen as soon
as the line paid out, allowing Allen to stop the turn and prevent Young's
death.  (*See* Tr. Trans. at 627; 711.)

defendant was negligent and (4) that the defendant's negligence caused decedent's injury.  *Scoran v. Overseas Shipholding Grp., Inc.*, 703 F. Supp. 2d 437, 446 (S.D.N.Y. 2010).  "The employer's fundamental duty under the Jones Act is to provide its seaman with a reasonably safe place to work."  Thomas J. Schoenbaum, Admiralty and Maritime Law, § 621 (5th ed.) ("*Schoenbaum*").  "Regarding causation, under the Jones Act, an employer is liable to its employee if employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."  *See Rogers v. Mo. Pac. R.R. CO.*, 352 U.S. 500, 506 (1957) (emphasis in original) (internal citations omitted).  The Second Circuit has adopted this relaxed burden, often referred to as the "featherweight" standard.  *See Williams v. Long Island R.R.*, 196 F.3d 402 (2d Cir. 1999); *Borges v. Seabulk Int'l, Inc.*, 456 F. Supp. 2d 387, 390 (D. Conn. 2006) ("the standard of proof for causation when asserting negligence under the Jones Act is relaxed, sometimes termed 'featherweight.'"); *CSV Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2644 (2011) (affirming that a defendant caused or contributed to an injury "if [its] negligence played a part—no matter how small—in bringing about the injury.") (quotations omitted).

   B.  *Moran was both Directly and Vicariously Negligent under the Jones Act*

The facts demonstrate that Moran was at fault under the Jones Act's "featherweight" standard, both for its absence of any safety training, guidelines, policies or procedures in connection with line-handling and vicariously for the resulting negligence of its employees.

Moran's inadequate training and safety procedures not only contributed to the unseaworthiness of the Tug and its crew, but also constituted negligence under the Jones Act. *See Harrington v. Atlantic Sounding Co., Inc.*, 2013 WL 94815, at *7 (E.D.N.Y. January 7, 2013) (finding Jones Act negligence where employer "provided no instruction or training to its crew as to how best to perform the [maritime] task [at hand] . . ."); *see also In re Complaint of Sea Wolf Marine Towing & Transp., Inc.*, 2007 WL 3340931 (S.D.N.Y. Nov. 6, 2007). A maritime employer is directly negligent for its failure to "provide . . . instruction or training to its crew as to how to best perform the [maritime] task [at hand]." *Harrington v. Atlantic Sounding Co., Inc.*, 2013 WL 94815, at *7 (E.D.N.Y. Jan. 7, 2013). As found above, Moran was directly responsible for but failed to provide guidelines, policies, procedures, or ongoing training as to how to safely handle lines under pressure, including conducting a

67

swing maneuver and appropriately handling a capstan. *See supra Section I; B.* Moran's omissions in this regard were inconsistent with industry standards and violated the company's duty of care to its employees. (*See* Tr. Trans. at 632; 713 (Bates and Hibbard establishing the absolute necessity of receiving the "all fast" before coming right and ensuring safety training, policies and guidelines for the swing maneuver).)

Additionally, Moran did not modify the location of the capstan controller, despite clear safety concerns, or require that the tug operator receive an "all-fast" from the deckhand before introducing the right rudder, despite dangers associated with handling lines under strain. Moran's negligence in failing to ensure a safe work environment or provide adequate training of its employees on these matters, as established, directly contributed to Young's death. *See supra Section I; B.; see also Schoenbaum* ("The employer's fundamental duty under the Jones Act is to provide its seaman with a reasonably safe place to work.").

Moran is also vicariously liable for the negligent acts of its employee, Allen. In a "Jones Act context . . . an employer may be vicariously liable for its employee's negligence

under the doctrine of respondeat superior so long as the negligence occurred in the course of employment" at the time of the accident. *Beech v. Hercules Drilling Co., LLC*, 691 F.3d 566, 571 (5th Cir. 2012) (internal quotation marks and citations omitted); *see also Sobieski v. Ispat Island, Inc.*, 413 F.3d 628, 632 (7th Cir.2005). There is no dispute that both Young and Allen were acting in the course of their employment and in order to further the interests of Moran at the time of the swing maneuver.

Allen both swung too far right, and introduced right rudder before receiving the "all-fast" from Young. The physics and calculations comported with the descriptions from the fact witnesses establish that, to a reasonable degree of certainty, the towline pulled off the capstan as a result of Allen putting in right rudder to check the left swing before getting the "all-fast" from Young and ensuring that the capstan was secure. (Tr. Trans. at 327.) Allen's combined errors thus directly resulted in the rapid pulling off of the towline; the capture of Young in the capstan; and the subsequent fatal crushing of Young as the towline pulled off with great force.

69

Because these errors were the result of Allen's own negligence, as well as the inadequate training provided by Moran, Moran is liable under the Jones Act both directly for its inadequate training and unsafe policies, and vicariously for Allen's resulting negligence.

### III. __Limitation of Liability Has Not Been Established__

*A. The Applicable Standard*

Limitation of liability is available only if a shipowner establishes that the fault causing the loss occurred without the owner's privity or knowledge.  46 U.S.C. § 30505(b).  "The determination of whether a shipowner may limit liability [] involves a two-step analysis: (1) a determination of what acts of negligence or unseaworthiness caused the casualty and (2) whether the shipowner had knowledge or privity of these acts." *Schoenbaum*, § 15-6; *see In re Complaint of Messina*, 574 F.3d 119, 126-27 (2d Cir. 2009).  To sustain its burden, Moran "must show how the loss occurred, together with its lack of privity to or knowledge of the asserted cause.  If it cannot show how the loss occurred, a defendant must exhaust all the possibilities, and show that as to each it was without the requisite privity or knowledge."  *Terracciano v. McAlinden Const. CO.*, 485 F.2d 304,

70

307-08 (2d Cir. 1973).   Further, Moran need not have had actual

knowledge of the unseaworthiness or negligence; it is sufficient

that Moran "should have known" of the breach.   *See In re Marine*

*Sulphur Queen*, 460 F.2d 89, 101 (2d Cir. 1972).   Indeed, "The

question with regard to corporate owners is not what the

corporation's officers and managers actually knew, but what they

objectively ought to have known."   *Complaint of Patton-Tully*

*Transp. Co.*, 797 F.2d 206, 211 (5th Cir. 1986) (emphasis in

original).


"The recent judicial trend has been to expand the

scope of activities that fall within the privity of the owner,

including imputing to corporations knowledge or privity of

lower-level employees." *Matter of Oil Spill by Amoco Cadiz Off*

*the Coast of France on March 16, 1978*, 954 F.2d 1279, 1303 (7th

Cir. 1992) (citations omitted); *In re SkipperLinder Indus.,*

*Inc.*, 2002 WL 32348827 (W.D. Wis. Jan 31, 2002) (quoting *In re*

*Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1303 (7th Cir.

1992)) (the "recent trend has been to enlarge the scope of

activities within the 'privity or knowledge' of the shipowner,

including . . . requiring shipowners to exercise an 'ever-

increasing degree of supervision and inspection'".).   If an

injury occurs as a result of a shipowner's failure to use "due

71

and proper care to provide a competent crew," that negligence is necessarily "within the owner's privity." *Messina*, 574 F.3d at 127. Similarly, "the failure of a ship's master to exercise diligence in selecting, training, or supervising crew members whose [acts or omissions] contribute to an accident is proper ground to deny limitation of liability." *Potomac Transp., Inc. v. Ogden Marine, Inc.*, 909 F.2d 42, 46 (2d Cir. 1990).

### B. *Moran has not Met its Burden of Proving Limitation of Liability*

Moran has not met its burden of proving that limitation of liability is appropriate in this action. To the contrary, Claimant has sufficiently established Moran's privity or knowledge.

Petitioner has alleged that "Moran had no notice of any condition, defect or prior accident that placed them on notice that the capstan arrangement or the swing maneuver procedure was inadequate." (Pet. Mem. of Law at 20.) To the contrary, Moran was aware of at least seven accidents involving a capstan, and a 2005 deckhand death on tug Davis Sea while handling lines. (Tr. Trans. at 1419-1420.) Additionally, Moran's Vice President, Keyes, testified that several times

72

Moran employees were injured while working near the capstan,
that "it can be dangerous to work around the capstan," and that
the company was aware of the importance of disseminating safety
procedures and guidelines through its OPPM and ongoing safety
meetings to ensure safety. (Tr. Trans. at 1414-15.)  Moran
adheres to the ISM and the RCP, which respectively require that
"the company should establish procedures, plans and
instructions, including checklists as appropriate, for key
shipboard operations concerning the safety of the personnel" and
"establish documented procedures for the use of . . . winches."
(Tr. Trans. at 400; Exhibit 399.)  The capstan is a type of
winch, and line-handling is a "key shipboard operation."  (Tr.
Trans. at 605.)

    Despite this knowledge of past accidents and despite
clear awareness of the safety requirements imposed by the ISM
and RCP,[5] Moran failed to issue any written guidelines,
trainings, or instructions whatsoever for line handling of any
kind.  (Tr. Trans. at 1398.)  Further, Moran knew or should have
known from its experience as an operator of tug boats the effect

---

[5] OSHA also issued Moran a formal citation as to the location of the capstan
controller.  The citation stated that "[i]ssuance of this citation does not
constitute a finding that a violation of the Act has occurred unless there is
a failure to contest as provided for in the Act, or if contested, unless this
Citation is affirmed by the Review Commission or Court." (Exhibit 167.)

of swinging the Tug to the right before the "all fast" signal
had been given and the capstan was secure, and the safety
concerns associated with placing the capstan controller too
close to the capstan.  Moran could have implemented such
procedures, (Tr. Trans. at 1409-10), but instituted no job
hazard analyses, risk assessments, or capstan training until
after Young's death.  (Tr. Trans. at 1403-04.)  Moran did not
communicate to its crew the importance of receiving the "all
fast" before a tug was swung back right or a line was subjected
to pressure, or attempt to move the location of the capstan
controller to ensure a safer work environment until after
Young's death.  *See Dover Barge Co. v. Tug Crow*, 642 F. Supp. 2d
266, 275 (S.D.N.Y. 2009) (an employer "may not limit his
liability under the Act if the ship is unseaworthy due to the
equipment which was defective or unsafe at the start of the
voyage."); *see also Marcus v. Energy Trans. Corp.*, 1992 WL
196784, at *2 (S.D.N.Y. July 31, 1992) ("A violation of safety
regulations render the ship unseaworthy and if such
unseaworthiness was the proximate cause of the Plaintiff's
injuries it would also render the Defendant shipowner liable")
(internal citations omitted).

74

Moran thus failed to adequately "train[] or supervis[e]" its crew or create a safe environment with respect to line handling and the swing maneuver. *Potomac Transp., Inc. v. Ogden Marine, Inc.*, 909 F.2d 42, 46 (2d Cir. 1990) ("the failure of a ship's master to exercise diligence in selecting, training, or supervising crew members whose [acts or omissions] contribute to an accident is proper ground to deny limitation of liability."). This failure, which was a proximate cause of Young's death, renders limitation of liability inappropriate. *See id; see also Hercules Carriers*, 768 F.2d at 1576-77 (finding that operational negligence of the crew "became the responsibility of the owner when it failed to train its crew"); *Complaint of Cameron Boat Rentals, Inc.*, 683 F. Supp. 577, 585 (W.D. La. 1988) (finding operational errors "are imputable to the owner where they are the natural consequence of the owner's unwritten policies.").

As found above, the facts as established by the record also refute Moran's contention that Young's death resulted from his negligence in pressing the wrong button on the capstan controller causing it to operate in reverse.

**IV.  Damages Have Been Established**

75

Avril Young, as the estate representative, is entitled
to recover on behalf of all beneficiaries for the wrongful death
of her husband under the Jones Act and general maritime law,
both for the losses suffered as a result of his death as well as
his survivor claims. *See Miles*, 498 U.S. at 26, 30.  Under the
Jones Act, beneficiaries include the surviving spouse and
children; general maritime law extends this class to include
other dependent relatives.  *See* 46 U.S.C. App. § 688 ("Jones
Act"), referring to FELA, 45 U.S.C. App. § 51 (FELA wrongful
death beneficiaries are "the surviving widow or husband and
children of such employee"); *Schoenbaum*, § 8-3 (beneficiaries of
an action for wrongful death under the general maritime law
include the surviving spouse, children, parents and dependent
relatives).  In this case, then, the beneficiaries are Young's
widow Avril Young, his minor son Nicholas Young, his adult
daughter Sheila Young, and Young's granddaughter, Kaitlyn Young,
who were all financially dependent on Young at the time of his
death.

   *A.  The Applicable Standard*

76

Under the Jones Act as well as general maritime law, Avril Young can recover for all pecuniary losses, which include loss of support from past and future earnings, the loss of Young's household services, Nicholas's loss of parental care and guidance, and damages for Young's conscious pain and suffering. *See De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 141 (5th Cir. 1986) ("Recoverable items include loss of support from [decedent's] past and future earnings; loss of [decedent's] household services; loss of parental nurture and guidance of his minor children until the age of majority; and recovery for [decedent's] predeath pain and suffering").

Courts in the Southern District of New York have looked to state law for guidance on damages determination in maritime cases. *See Bachir v. Transoceanic Cable Ship Co.*, 2002 WL 413918 (S.D.N.Y. Mar. 15, 2002) (where the court examines numerous New York state cases in determining damages award); *see also Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) (a longshoreman case cited by *Bachir*, where the Court of Appeals stated that, in assessing a damages award, "courts have reviewed awards in other cases involving similar injuries" and cited New York State case law).

77

In assessing damages, the fact-finder should ascertain the past and future impact of the injury by examining (1) the nature, extent, and duration of the injury; (2) the plaintiff's pain, discomfort, suffering, and anxiety; and (3) any lost earnings. 2 M. Norris, *The Law of Seamen* § 697 (3d ed.1970) ("Norris"). Damages must be supported by the facts established in the record and cannot be speculative. *See* Saleeby v. Kingsway Tankers, Inc., 531 F. Supp. 879, 888 (D.C.N.Y. 1981);

*B. Pecuniary Loss Has Been Established*

As found above, pecuniary loss has been established.

1. <u>Pre-Death Pain and Suffering</u>

A maritime wrongful death claimant is entitled to recover for the conscious pain and suffering a decedent experienced prior to death so long as there is some evidence that the decedent had, at some level, an awareness of what he was going through. To recover this category of damages, no particular period of consciousness is necessary. *See Hinson v. S.S. Paros*, 461 F. Supp. 219 (S.D. Tx. 1978) (allowing recovery for suffering for only the "fleetest seconds."); *see also*

78

*McDougald v. Garber*, 73 N.Y.2d 246, 255 (1989) (a fact finder cannot be required to "sort out varying degrees of cognition and determine at what level a particular deprivation can be fully appreciated."). Instead, a claim for conscious pain and suffering requires a claimant to present only proof that the injured party "experienced some level of cognitive awareness following the injury." *Sanchez v. City of New York*, 97 A.D.3d 501, 506 (1st Dep't 2012); *see also McDougald*, 73 N.Y.2d at 255 (fact finder should only have to consider whether a person had "some level of awareness in order for plaintiff to cover") (internal quotations omitted).

Evidence of conscious pain and suffering may be substantiated by medical records, even in the absence of expert medical testimony to support the claim. *Dowling v. Dowling*, 138 A.D.2d 345, 345 (2d Dep't 1988). Consciousness may also be presumed in certain factual circumstances. *Cook v. Ross Island Sand and Gravel Co.*, 626 F.2d 746 (9th Cir. 1980). Once evidence of pre-death conscious pain and suffering has been admitted, "the degree of pain" becomes "only a factor to be considered in determining the amount of damages, not whether damages should be awarded at all." *Williams v. City of New York*, 71 A.D.3d 1135, 1137-38 (2d Dep't 2010).

Claimant has sufficiently established conscious pain and suffering in this case. All three physicians agreed that Young experienced some period of conscious pain and suffering; the discrepancy was only as to how long that pain occurred. Though Dr. Thanning testified that Young went into a neurogenic coma caused by the pain from his crushing injuries, causing loss of consciousness within ten seconds, there is no medical or physical support for this theory. (Tr. Trans. at 1539-52.) To the contrary, Dr. Zhang and Dr. Bollinger in credible testimony as found above both relied on concrete physical evidence and medical journals in concluding that, based on the petechial hemorrhages, the location of the traumatic injuries and the absence of blood below the torso, Young was conscious for more than two minutes. (Zhang Dep. Tr. at 56-59; Tr. Trans. at 825-26; 829.) It is further "clearly inferable that [Young], caught by the winch which was grinding him to death, suffered intense pain while also confronting the certainty of death." *Strehle v. United States*, 860 F. Supp. 136 (S.D.N.Y. 1994).

Claimant has urged that an award of $2 million for the period of time that Young was consciously suffering is consistent with jury verdicts in similar cases. *See, e.g.*,

80

*McIntyre v. United States*, 447 F. Supp. 2d 54, 118-19 (D. Mass. 2006) (awarding $3,000,000 for three minutes of conscious pain and suffering from gunshot wound); *Hackert v. First Alert*, 2006 WL 23352330 (N.D.N.Y. Aug. 11, 2006), *aff'd* 271 Fed. Appx. 31 (2d Cir. 2008) ("considering the 35% comparative negligence allocation," an appropriate judgment would be "$650,000 for the conscious pain and suffering of [defendant one] and $1.3 million for the conscious pain and suffering of [defendant two]," both of whom suffered for short periods). Moran, to the contrary, posits that analogous precedent shows that an award of between $35,000 to $100,000 is appropriate. *See, e.g.*, *Strehle v. United States*, 860 F. Supp. 136 (S.D.N.Y. 1994) (decedent was awarded $50,000 for conscious pain and suffering noting that the period of intense pain could not have lasted long); *Zilko v. Golden Alaska Seafoods, Inc.*, 2004 Wash. App. LEXIS 2205 (Ct. App. Wa. 2005) ($200,000 awarded for conscious suffering in drowning death where period of consciousness was limited); *Cook v. Ross Island Sand & Gravel*, 626 F.2d 746 (9th Cir. 1980) (award for two and a half minutes of conscious suffering in a drowning death reduced from $100,000 to $35,000).

New York courts, in turn, have awarded a range of damages for conscious pain and suffering of short durations

81

similar to that of Young's. *See Givens v. Rochester City Sch.*
*Dist.,* 294 A.D.2d 898, 899 (N.Y. App. Div. 4th Dep't 2002) ($1
million verdict reduced to $300,000 where decedent suffered less
than one hour after sustaining a stab wound); *Rodd v. Luxfer USA*
*Ltd.,* 272 A.D.2d 535, 536 (N.Y.App. Div.2d Dep't 2000) ($1
million verdict reduced to $300,000 where decedent suffered no
more than 30 minutes after sustaining a chest wound due to an
explosion); *Glassman v. City of New York,* 225 A.D.2d 658, 658
(N.Y. App. Div. 2d Dep't 1996) ($1.4 million award reduced to
$500,000 where decedent suffered massive injuries but was only
minimally conscious before death after being struck by a car);
*Torelli v. City of New York,* 176 A.D.2d 119, 124 (N.Y.App. Div.
1st Dep't 1991) (court awarded $250,000 where decedent suffered
between fifteen minutes and one hour from horrendous injuries
after car collision); *Walker v. New York City Transit Authority,*
130 A .D.2d 442, 443 (N.Y.App. Div. 1st Dep't 1987) ($1 million
award reduction to $600,000 affirmed where decedent suffered
very briefly and his level of consciousness was unknown after he
was struck by a train).

Conscious pain and suffering are by definition
subjective to the sufferor and result from the totality of the
circumstances, the duration of the experience, the injuries and

82

their effect, the inevitability of the outcome, the shock of the
event and the values of the society and of the sufferer. Courts
in evaluating these awards must guard against excessive awards
based on sympathy and emotion on the one hand and a mechanical
mathematical approach on the other. Each injury, each
circumstance, is unique as is each individual. To strike a
balance that society will deem appropriate and do justice to the
Decedent's final agonies is a daunting, almost impossible task.
*See, e.g.*, *Strehle v. U.S.*, 860 F. Supp. 136, 140 (S.D.N.Y.
1994) ("The problem of fixing a monetary award is exacerbated by
the fact that pain and suffering can not rationally be given a
dollar value. Would any of us willingly endure the pain and
suffering experienced by the decedent in return for a
substantial monetary payment?"); *Gibbs v. United States,* 599
F.2d 36, 39 (2d Cir.1979) ( "measuring pain and suffering in
dollars is inescapably subjective"); *Consorti v. Armstrong World
Industries, Inc.;* 64 F.3d 781, 788 (2d Cir. 1995), *rev'd on
other grounds*, ("While the law seeks by reasonable compensation
to make a plaintiff whole, we must recognize that compensation
for suffering can be accomplished only in a symbolic and
arbitrary fashion. There are at least two serious shortcomings
to the endeavor. First, money awards do not make one whole; they
do not alleviate pain. Second, there is no rational scale that

83

justifies the award of any particular amount, as opposed to some very different amount, in compensation for a particular quantum of pain."). With the relevant precedents, the facts and these considerations in mind, an award of $750,000 for Young's pain and suffering while being crushed to death is appropriate.

### 2. Lost Past and Future Financial Support and Lost Household Services

Avril Young may recover on behalf of all estate beneficiaries for the financial harm that they have suffered as a result of the wrongful death of Young. That loss is classified as "lost future support." *See Cook*, 626 F.2d at 784 n.4 (explaining that lost support "includes all the financial contributions that the decedent would have made to his dependents had he lived."). Lost future support applies in actions under both the Jones Act and general maritime law. *Law v. Sea Drilling Corp.*, 523 F.2d 793, 794 n.3 (5th Cir. 1975); *McCrann v. United States Lines, Inc.,* 803 F.2d 771, 773 (2d Cir. 1986) (basic concept involved in calculating damage awards for lost wages of Jones Act claimant is to require tortfeasor to "put his victim in the same economic position that he would have occupied had he not been injured"); *Saleeby v. Kingsway Tankers, Inc.,* 531 F.Supp. 879, 888 (S.D.N.Y.1981) (Jones Act claimant

84

who is successful in establishing liability is entitled to lost
future earnings) (citing *Calcagni v. Hudson Waterways Corp.,* 603
F.2d 1049 (2d Cir.1979)).

Petitioner concedes the applicability of loss of
support damages, but maintains that Claimant has failed to
adequately establish non-speculative damages. *See Shu-Tao Lin
v. McDonnell Douglas Corp.,* 574 F. Supp. 1407, 1414 (S.D.N.Y.
1983). To the contrary, Claimant, as established through its
expert Dr. Moore, has provided sufficient concrete evidence to
establish loss of support damages in this case.

Lost future support is typically calculated based on
gross future earnings (including benefits) with a deduction for
personal consumption and then reduced to present value. *See,
e.g., Howard v. Crystal Cruises, Inc.,* 41 F.3d 527, 530 (9th
Cir. 1994) ("After calculating the total amount of damages to be
awarded the appellant for her loss of [decedent's] support and
services, the district court reduced those figures . . . to
reflect . . . personal consumption."); *Knierim v. U.S. Gov't
Dep't of Navy*, 802 F. Supp. 965, 977 (S.D. Ind. 2011)
(calculating "value of future support" as decedent's income over
his predicted life expectancy less his personal consumption);

85

*Shu-Tao Lin v. McDonnell Douglas Corp.*, 574 F. Supp. 1407, 1415 (S.D.N.Y. 1983) *aff'd in part, rev'd in part*, 742 F.2d 45 (2d Cir. 1984) (loss of support measured as future income reduced by personal consumption)(reversed on other grounds).  Lost future earnings in New York are not reduced by taxes. *See Estevez v. United States*, 74 F. Supp. 2d 305, 307 (S.D.N.Y. 1999) (where New York State damages law was applied to action brought under federal statute, and court held New York state law requires that lost future earnings not be reduced by taxes for any defendant).

The amount of personal consumption is based on an expert's opinion and the use of statistical studies taking into account certain factors such as household size, household income and the age of minor dependents, as most households do not keep actual records of what portions of their incomes are spent on what types of expenses.  Moran's expert, Dr. Fitzgerald, did not explain his methodology, showed no mathematical calculations, and ignored significant personal details in compiling his report, including Young's work history.  (Tr. Trans. at 1649-50.)  Dr. Fitzgerald also made incorrect factual assumptions in his calculations, including (1) assuming that Young maintained two households; (2) ignoring Young's sole custody of his minor child; (3) failing to account for care of Young's daughter

86

Sheila; (4) not calculating the loss of Moran's health care benefits; (5) incorrectly reducing the economic loss of tax liability and (6) employing a non-existent Treasury bond rate when reducing the economic loss to present value. (Tr. Trans. at 1625; 1636-38; 1665-66.)

In contrast, Dr. Moore's testimony, qualifications and methodology[6] were highly credible. (Tr. Trans. at 1442-45; Exhibit 251, at 6.) Dr. Moore's final calculation in November of 2011 totals $692,235 for lost support, assuming that Young worked to the age of seventy. (*Id.*) Dr. Moore explains that his figure does not include any lost pension income that Young would have received from retirement through his life expectancy, or any lost compensation for lost household services, benefits or earnings. (*Id.*) For household services, Dr. Moore calculated damages at $80,280. (*Id.*)

Claimant therefore asserts that the total included in Dr. Moore's report for lost support should be supplemented to account for childcare services, cooking, household work, the

---

[6] Dr. Moore's report was based on reviewing multiple factors, including Young's (1) tax returns; (2) credit card statements; (3) checking account deposits, including of his wife; (4) earning statements from Moran; (5) personal work history, including personnel file from Moran; and (6) employee benefits at Moran; as well as the deposition of Keyes. (Exhibit 251.)

dependency of Young's adult daughter Sheila, the possibility of
job promotion, and the lost value of flexible spending amounts,
totaling in an award of $900,000 for economic loss. (*See* Tr.
Trans. at 1442; 1485; 1456; 1486; 1439.)   However, Claimant
does not establish a methodology for calculating the dependency
of Young's daughter Sheila or Young's additional household
services.   Further, Young's potential job promotion is
speculative.   Damages are thus awarded instead based on Dr.
Moore's documented calculations, totaling $80,280 for lost
household services (*see* Exhibit 251, at 6) and $692,235 for lost
future support.


### 3.  Loss of Parental Guidance, Nature and Nurture


Damages for the loss of nurture are intended to
compensate a child for the deprivation of parental guidance,
support and training; these damages are available under both the
Jones Act and general maritime law. *In Matter of American River
Transp. Co.*, 1997 WL 382055, at *1 (E.D. La. July 8, 1997); *see
also Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583,
593 n. 9a (2d Cir. 1961), *cert. denied*, 368 U.S. 989 (1962).
"An award for loss of nurture does not extend to compensation
for grief resulting from the loss of the warm and loving

88

parental relationship.  It is a more limited and more measurable

award for loss of valuable services in the nature of

instruction, training and guidance." *Red Star Towing & Transp.*

*Co. v. The "Ming Giant"*, 552 F. Supp. 367, 377 (S.D.N.Y. 1982).

          The facts with respect to the relationship between

Young and his son having been found and set forth above,

Nicholas lived with his father from 2007 until Young's death in

2009, and provided daily contact, efforts, and academic support.

(Tr. Trans. at 918; 1000-1011.)  His father's death has affected

Nicholas, who has since had his first fight at school, stopped

playing on his baseball team, and experienced significant

academic difficulty.  (Tr. Trans. at 920; 1011-1012.)  Claimant

has urged $2,000,000 for loss of parental care and guidance.

*See, e.g.*, *Campbell v. Diguglielmo*, 148 F. Supp. 2d 269

(S.D.N.Y. 2001) (court found that an award of $1,500,000 for

loss of parental care and guidance did not deviate materially

from what would be reasonable compensation); *Paccione v.*

*Greenberg,* 682 N.Y.S.2d 442, 443-44 (N.Y. App. Div. 1998)

(reducing an award for loss of parental guidance of $2,500,000

per child to $1,500,000 per child); *Garcia v. New York City*

*Health and Hospitals,* 230 A.D.2d 766 (2d Dep't 1996) (reducing

89

judgment for loss of parental guidance from $1,000,000 to $750,000).

Moran has asserted that Nicholas's damages for nurture and guidance must be limited to reflect fact, that Nicholas did not live with his father for most of his childhood, and that the loss should be limited to six years (i.e. until Nicholas reaches the age of eighteen). *See Zilko v. Golden Alaska Seafoods, Inc.*, 2004 Wash. App. LEXIS 2205 (Ct. App. Wa. 2005) (court awarded $15,000 per year where evidence was presented as to the cost of social workers and teachers providing equivalent services as to the character, time and devotion of the decedent to this children). According to Moran, an award of between $5,000 to $20,000 per year is more appropriate. *See, e.g., Boykin D.Y. A/S v. Bergesen*, 835 F. Supp. 274 (E.D. Va. 1993) ($12,000 per year where father was "exemplary" and "exceptionally fit"); *Zilko*, 2004 Wash. App. LEXIS 2205 ($15,000 per year); *Brown v. United States*, 615 F. Supp. 391, 400 (D. Mass. 1985) ($5,000 per year in death of fisherman); *Red Star Towing & Transp. Co.*, 552 F. Supp. at 378 (approximately $14,000 per year).

Based on analogous precedent and on the extent of
Young's relationship with his son, damages of $15,000 per year,
for the remaining six years of Nicholas's adolescence, are
appropriate.

### 4.  Loss of Society

The parties differ as to whether loss of society is
appropriate under general maritime law and in Jones Act cases.
However, the Supreme Court stated in *Miles v. Apex Marine*, 498
U.S. 19, 30 (1990) that Congress's statutory language in DOSHA,
limiting "recoverable damages in wrongful death suits to
'*pecuniary* loss sustained by the persons for whose benefit the
suit is brought,'" foreclosed recovery for non-pecuniary loss,
such as loss of society, in a general maritime action for
wrongful death.  *Id.* at 31 (quoting 46 U. S. C. App. § 762).
The Supreme Court further held that there is "no recovery for
loss of society in a Jones Act wrongful death action,"
regardless of whether the action is a result of negligence or
unseaworthiness.[7]  As such, no damages for loss of society will

---

[7]  Claimant's cited precedent establishes only that the Jones Act allows
causes of action for negligence; not that loss of society is an appropriate
remedy for these actions. (Claimant Memorandum of Law, "Mem. of Law"; at 42-
44.)  Even a liberal reading of the Jones Act does not as urged by the
Claimant overcome the Supreme Court's ruling on this issue.

be awarded. *See, e.g.,* *Senator Linie Gmbh & Co. Kg v. Sunway Line, Inc.*, 921 F.3d 145, 169 (2d Cir. 2002) (recognizing that loss of society damages are not applicable in wrongful death causes of action under the general maritime law or the Jones Act); Stepski v. M/V NORASIA ALYA, 2010 WL 6501649, at *10 (S.D.N.Y. Jan. 14, 2010) (Granting summary judgment on issue of loss of society damages where collision at issue took place outside the territorial waters of the state of New York and was governed by the general maritime law and therefore, pursuant to *Miles,* the general maritime law does not provide [defendant] with damages for loss of society).

### 5. Punitive Damages

Punitive damages may only be awarded where a defendant's conduct is intentional, wanton and reckless, or constitutes gross negligence. *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241 (S.D.N.Y. 2001). Claimant asserts that the accident was caused by the premature initiation of the final turn of the swing maneuver before the "all-fast" was given and from the unsafe placement of the equipment on the Tug. Claimant does not contend and the facts do not establish that the maneuver was performed with gross negligence or willful

misconduct, or that the placement of the equipment by Moran involved such intentional or wanton conduct. Given the lack of evidence or argument by Claimant that would provide a legally sufficient basis for such an award, Claimant's punitive damage claim is dismissed.

### 6. Prejudgment Interest

Although the allowance of prejudgment interest in admiralty is said to be a matter committed to the trial court's discretion, *see United States Willow Furniture Co. v. La Compagnie Generale Transatlantique*, 271 F. 184, 186-87 (2 Cir. 1921); *O'Donnell Transportation Co. v. City of New York*, 215 F.2d 92, 94-95 (2d Cir. 1954), it should be granted in the absence of exceptional circumstances. *See, e.g.*, *Federal Ins. Co. v. Sabine Towing & Transp. Co.*, 783 F.2d 347, 352 n.4 ("In this Circuit, prejudgment interest will be denied in admiralty cases only under extraordinary circumstances"); *The Wright*, 109 F.2d 699, 702 (2d Cir. 1940); *Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583, 592-93 (2 Cir. 1961), cert. denied, 368 U.S. 989 (1962). Moran has not established any special circumstance why prejudgment interest should not be applied.

93

Prejudgment interest in this case is calculated using New York state law. *Complaint of Dammers & Vanderheide & Scheepvaart Maats Christina B.V.*, 836 F.2d 750, 755 (2d Cir. 1988) ("when a lone claimant brings an action seeking an amount in excess of the limitation fund, the district court must lift the stay against other [state court] proceedings if that claimant concedes the admiralty court's exclusive jurisdiction to determine all issues relating to the limitation of liability.").

Avril Young as the single claimant could have proceeded in New York state court, where she would have been awarded the state statutory prejudgment interest rate on any damages award.  It is thus reasonable to employ the same rate to the damages for which prejudgment interest are available as she would have received had she dissolved the stay on these proceedings and pursued her action in state court.  Here, prejudgment interest is appropriate as to all claims, whether under the Jones Act or general maritime law. *See Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 491 (5th Cir. 1985) ("We hold, therefore, that when a Jones Act claim is brought under the court's admiralty jurisdiction, and hence the case is tried to the court and not the jury, the allowance of

94

prejudgment interest is within the discretion of the trial court
even if there is not a finding of unseaworthiness"); *Webb v.
TECO Barge Linc, Inc.*, 2012 WL 7800851, at *33 (S.D. Ill. 2012)
(same); *Benson v. Diamond Offshore Drilling, Inc.*, 2011 WL
3794908, at *9 (M.D. La. Aug. 26, 2011) (same).

Under New York law, the rate of prejudgment interest
is set at nine percent per annum.  N.Y. C.P.L.R. § 5004.
Claimant is therefore entitled to prejudgment interest at an
annual rate of 9% measured from the date of Young's death,
December 27, 2009.  The dollar amount is calculated by
multiplying the total amount of past damages by nine percent,
then dividing that period by 365 (representing the days of a
year) and multiplying that figure by the number of days between
December 27, 2009 and the date of judgment.  *See Webb*, 2012 WL
780851, at *34 n.13.

**CONCLUSION**

Based upon all the prior proceedings and the facts and
conclusions of law set forth above, judgment is awarded to Avril
Young.  Settle judgment on notice.

95

It is so ordered.


**New York, NY**

**November 15, 2013**

ROBERT W. SWEET
U.S.D.J.